1

2

3

**UNITED STATES DISTRICT COURT**

4

**NORTHERN DISTRICT OF CALIFORNIA**

5

6

7

8   *IN RE* VIOLIN MEMORY SECURITIES           Case No.: 13-CV-5486 YGR

LITIGATION

9                                             **ORDER GRANTING IN PART DEFENDANTS'**
                                              **MOTIONS TO DISMISS**

10

11

12

13

14          Lead Plaintiffs Ali Shehk and Alan Richards (collectively "Plaintiffs") bring this

15   consolidated class action complaint against Defendants Violin Memory, Donald Basile, Dixon

16   Doll, Cory Sindelar, Howard Bain III, Larry Lang, Jeff Newman, Mark Rosenblatt, David Walrod,

17   (together, "Violin Memory Defendants") and J.P. Morgan, Deutsche Bank Securities Inc., Merrill

18   Lynch, Barclays Capital Inc., Robert Baird and Co., Pacific Crest Securities LLC, and EM

19   Securities LLC (together "Underwriter Defendants").

20          The Consolidated Amended Complaint ("CAC") alleges violations of the Securities Act of

21   1933 ("Securities Act") in connection with the initial public offering ("IPO") of Violin Memory,

22   Inc. ("Violin Memory"), a California-based company that developed and sold flash-based memory

23   devices.  Plaintiffs assert that Violin Memory's Registration Statements[1] contained material and

24   misleading omissions and misrepresentations.  (CAC ¶ 3.)  On behalf of themselves and all others

25

_____

26   [1]      Documents comprising the "Registration Statements" include:  Violin Memory's

Registration Statement filed with the SEC on Form S-1 on August 26, 2013 (Dkt. No. 63-2),

27   Amended Registration Statement filed with the SEC on Form S-1/A on September 16, 2013 (Dkt.

No. 69-1), and Prospectus filed with the SEC on Form 424B4 on September 27, 2013 (Dkt. No. 63-

28   1; "Prospectus").  (CAC ¶ 8.)

United States District Court
Northern District of California

1   who purchased or otherwise acquired Violin Memory securities in connection with the IPO,

2   Plaintiffs assert strict liability and negligence claims under Sections 11, 12(a), and 15 of the Act.

3   Both groups of Defendants, the Underwriter Defendants and the Violin Memory

4   Defendants, have filed motions to dismiss the CAC on the grounds that, generally, Plaintiffs have

5   failed to meet the pleading standard under Federal Rules of Civil Procedure 8 and 9 and have failed

6   to state a claim under Rule 12(b)(6).  (Dkt. Nos. 61, 66.)  Each group of defendants has joined in

7   the other's motion to dismiss.  Defendants have also filed requests for judicial notice (Dkt. Nos. 62,

8   69) and the Violin Memory Defendants have filed a separate Appendix to their Motion (Dkt. No.

9   68.)  Plaintiffs have moved to strike the Appendix and have opposed certain requests for judicial

10  notice.[2]  (Dkt. No. 74.)

11  These motions came on for hearing on June 17, 2014.  Having carefully considered the

12  papers submitted and the pleadings in this action, the arguments presented at the hearing, and for

13  the reasons set forth below, the Court hereby **GRANTS** in part the Motion to Dismiss with leave to

14  amend.  Defendants' Requests for Judicial Notice are **GRANTED** in part.  Plaintiff's Motion to

15  Strike is **GRANTED** in part.

16  **I.   FACTUAL BACKGROUND**

17  The facts herein are gleaned from the CAC, documents referred to therein, and judicially

18  noticed materials.

19  Violin Memory is a California-based technology company that designs and manufactures

20  flash memory devices for servers and networks in the form of flash memory arrays and memory

21  cards.  (CAC ¶ 10.)  Flash memory is a computer storage medium that can be electrically erased

22

23  [2]   Neither Violin Memory Defendants nor Plaintiffs have complied fully with the rules
24  governing local civil practice in this district.  Violin Memory Defendants have included additional
    argument in support of their Motion to Dismiss in the form of a chart itemizing the alleged
25  omissions in the CAC and contrasting those allegations with excerpts from the Registration
    Statement.  Defendants are hereby cautioned that they must seek leave of Court to file such
26  submissions in the future.  Plaintiffs' Motion to Strike challenges both the Violin Memory
    Defendants' Appendix and the various requests for judicial notice.  A motion to strike is not the
27  appropriate mechanism for challenging Defendants' requests for judicial notice.  The Court has
28  nonetheless considered these arguments as opposition to the requests.  (*See* Section IIA, *infra*.)

and reprogrammed.  (*Id.*)  It is used in memory cards, USB flash drives, solid-state drives, and similar products, for general storage and transfer of data.  (*Id.*)  Flash memory offers potential advantages compared to traditional hard disks or tape.  (*Id.*)  For example, it does not have the mechanical limitations and latencies (or slowness) of hard drives, and it has the potential to be more efficient relative to hard disks when considering speed, noise, power consumption, and reliability.  (*Id.*)

On September 27, 2013, Violin Memory issued an IPO of 18 million shares of common stock at $9 per share.  (CAC ¶ 1.)  In connection with the IPO, the Company filed several offering documents, including the Registration Statement on Form S-1 filed on August 26, 2013, Amended Registration Statement on Form S-1/A filed on September 16, 2013 ("Amended Registration Statement") and a Prospectus on Form 424B4 filed on September 27, 2013 ("Prospectus").  These documents contained information regarding the Company's financial status, business and management, and products.  These documents also contained risk disclosures amounting to twenty-six pages and pertaining to, among other things, the Company's number of customers, operating history, cash flow, its recent introduction of a new line of products, market acceptance of its products, and the impact of adverse economic conditions.  (Prospectus, at 5, 10–36; Amended Registration Statement at 11-37.)  The disclosures did not minimize the high-risk nature of the investment.  For example, relative to the financial condition of the Company, the Amended Registration Statement included the following:

- ***Without obtaining adequate capital funding or improving our financial performance, we may not be able to continue as a going concern.*** The report of our independent registered public accounting firm for the year ended January 31, 2013 included herein contains an explanatory paragraph indicating that there is substantial doubt as to our ability to continue as a going concern as a result of recurring losses from operations and negative cash flows . . . Our ability to continue as a going concern will be determined by our ability to complete this offering enabling us to fund our expansion plans and realize our business objectives. In addition, we have incurred a net loss and negative operating cash flows in each quarter since our inception and expect to incur losses in future periods as we continue to increase our expenses in order to position us to grow our business. If we are unable to obtain adequate funding from this proposed offering or in the future, or if we are unable to

3

grow our revenue substantially to achieve and sustain profitability, we may not be able to continue as a going concern.  (Dkt No. 69-1 at 12 (italics and bold in original; additional emphasis supplied).)

- We have experienced significant losses as we have continued to invest in our product development, customer service and sales and marketing organizations . . . We intend to increase our investments in our marketing services and sales organization and to continue investing significantly in research and development at the expense of near-term profitability. As a result, **we anticipate that we will incur net losses at least for the next several quarters**.  (*Id*. at 48 (emphasis supplied).)

The Amended Registration Statement disclosed the Company's relatively limited operating history, the difficulty of estimating future growth and the unlikelihood of similar growth rates in the future:

- [W]e have limited experience from which to formulate an accurate expectation of our product lifecycles, which could make it more difficult for us to plan our product development timelines to meet customer and market demands.  (*Id*. at 11.)

- ***Our revenue growth rate in recent periods is not likely to recur and is not indicative of our future performance***. You should not consider our revenue growth in recent periods as indicative of our future performance. We do not expect to achieve similar revenue growth rates in future periods. In fact, in future periods, our total revenue could decline. For example, even though our total revenue increased 373% in fiscal 2012 compared to fiscal 2011, our total revenue declined 53% for the three months ended April 30, 2012 compared to the three months ended January 31, 2012. You should not rely on our revenue for any prior quarterly or annual periods as an indication of our future revenue or revenue growth. If our revenue declines from our prior performance, it may be difficult to achieve and maintain profitability.  (*Id*. at 12-13 (emphasis in original).)

The Amended Registration Statement also highlighted the significant market and industry risks facing the Company and their potential to impact sales and profitability:

- The market for flash memory in storage products is rapidly evolving. Accordingly, our future financial performance will depend in large part on growth in this market and on our ability to adapt to trends in this market as they develop and evolve . . . The rapidly evolving nature of the technology in the data storage products market, as well as other factors that are beyond our control, reduce our ability to accurately predict our future performance. Our

products may never gain broad adoption, and changes or advances in technologies could adversely affect the demand for our products . . . A reduction in demand for flash-based data storage caused by lack of end-customer acceptance, technological challenges, competing technologies and products or otherwise would result in a lower revenue growth rate or decreased revenue, either of which would negatively impact our business and operating results.  (*Id.* at 18-19.)

- ***If we fail to develop and introduce new or enhanced products on a timely basis, our ability to attract and retain customers could be impaired and our competitive position would be harmed.*** (*Id.* at 20 (emphasis in original).)

Despite these and many other stark disclosures regarding business risks, Violin Memory's IPO was fully subscribed and Defendants allegedly raised over $145 million.  Soon after the IPO, the stock price plummeted:  Violin Memory's stock price closed on November 22, 2013, at $3.11 per share.  (CAC ¶ 2.)

In November 2013, Plaintiffs brought this putative class action against Defendants.  The operative CAC, filed on March 28, 2014, identifies alleged misrepresentations and omissions in the Registration Statement documents relating to the following topics, the disclosure of which purportedly caused the stock price to decline:[3]

(1) Material engineering and development problems with Violin Memory's 6000 Series Flash Arrays, a flash memory device;

(2) Material technical defects with Violin Memory's PCIe Cards, another of Violin Memory's flash memory devices, and that product's failure to gain market acceptance;

(3) That Violin Memory was having difficulties optimizing the PCIe Cards for Toshiba, one of its largest customers;

(4) Material negative trends concerning the Company's sales to the federal government, a major consumer of Violin Memory's products;

(5) Material negative information concerning Violin Memory Chief Executive Office

---

[3]     Despite including block quotations and purported excerpted sections of the Registration Statement in the CAC, Plaintiffs have neglected to include any citations referencing particular pages in the relevant documents.  Plaintiffs' failure to include citations has required that Defendants and the Court search extensively for each citation through hundreds of pages of SEC filings.  Should Plaintiffs elect to file a proposed First Consolidated Amended Complaint, they must include proper citations, including pincites.

1    Donald Basile's prior experience in the flash memory market and his "for cause"

2    termination from Fusion-io, a competitor flash memory company;

3    (6) Unusual transactions in the form of sales to Underwriters J.P. Morgan and BofA

4    Merrill Lynch that inflated the Company's sales and revenue figures just prior to the

5    IPO; and

6    (7) The amount of the Company's non-cancelable purchase orders.

7    (*See* CAC ¶ 31.)

8    The two specific Violin Memory products at issue in the CAC are the 6000 Series Flash

9    Memory Arrays ("6000 Flash Arrays"), which were introduced in September of 2011, and the

10   Velocity Peripheral Component Interconnect Express Flash Memory Cards ("PCIe Cards").  At the

11   time of Violin Memory's September 2013 IPO, substantially all of the Company's revenue was

12   derived from the Flash Memory Arrays.  (Dkt. No. 69-1 at 19.)   For the six months ended July 31,

13   2012, sales of the 6000 Series Flash Memory Arrays represented approximately 84% of the

14   Company's product revenue, and over the next year rose to 91%.  (*Id.* at 53.)   The PCIe Cards,

15   introduced in March 2013, were intended to provide generally the same technology and benefits of

16   the 6000 Flash Arrays, but in a different form for other segments of the market.  (CAC ¶ 11.)

17   Unlike the 6000 Flash Arrays, PCIe Cards can operate in both servers and workstations via PCIe

18   interfaces on a computer's motherboard.  (CAC ¶ 11.)  At the time of the IPO, the Company had

19   not derived significant revenue from the sale of the PCIe Cards.  (Amended Registration Statement

20   at 1-2.)

21   Plaintiffs claim that at the time of the IPO in September 2013, Violin Memory represented

22   that these products had been successfully designed, developed, and well-received in the market

23   across multiple segments, including the U.S. federal government, and that these representations

24   were false when made.  (*See* Opp. at 1.)  Plaintiffs specifically allege that the Registration

25   Statement failed to disclose material defects and development problems regarding the PCIe Cards,

26   including that the PCIe Cards were not optimized or sustainable due to material technical and

27   engineering defects.  Plaintiffs further allege that the Registration Statement contained an omission

28   or misleading statement with respect to how the PCIe Cards were programmed and developed for

Toshiba, a leading provider of flash memory and one of the Company's principal stockholders. The Registration Statement represented that the Company had entered into a PCIe Card development agreement with Toshiba, pursuant to which Violin Memory was to "develop a derivative product."  Plaintiffs allege that contrary to this representation, at the time of the IPO, the Company was experiencing "material difficulties building and developing the PCIe Cards in accordance with Toshiba's specifications."  (CAC ¶ 37.)  Plaintiffs also contend that although the Registration Statement represented that the PCIe cards had gained, or very likely would gain, market acceptance, that was not so.

Plaintiffs advance similar claims regarding the 6000 Flash Arrays, alleging that at the time of the IPO, Violin Memory was experiencing material engineering and development problems with these products as well.  According to the CAC, in the months leading up to the IPO, Violin Memory experienced material negative developments and engineering defects that resulted in breakdowns, failure to protect data, and the need for costly unique IP addresses that resulted in compatibility problems for customers.  (CAC ¶ 47.)

Next, Plaintiffs assert that material negative trends concerning sales to the federal government were not disclosed and that the government sequestration was negatively impacting the Company's revenue.  The Registration Statement represented that "[t]he United States government can also suspend operations if Congress does not allocate sufficient funds to a particular agency or organization, and the United States government may allow our competitors to protest our successful bids. The occurrence of any of these events may negatively affect our business, operating results and financial condition."  (CAC ¶ 54.)  Plaintiffs contend that this statement, and other similar statements, were untrue because at the time of the IPO, sales in the Company's federal division had been declining materially over the course of the fiscal year.  Plaintiffs further contend that the government sequestration negatively impacted the Company's revenues, but nowhere was that reflected in the Registration Statement.

Furthermore, Plaintiffs contend that negative information concerning the background and business experience of the Company's Chief Executive Officer ("CEO"), Donald Basile was improperly withheld and was material.  Plaintiffs argue that the failure to share the fact that Mr.

1    Basile was terminated "for cause" from his position as CEO at Fusion-io, Inc. was misleading.

2    (CAC ¶ 75.)  Plaintiffs allege that they and other members of the Class would have considered the

3    fact that Defendant Basile was recently terminated "for cause" from his position as Chief Executive

4    Officer with one of the Company's main competitors in their decision to invest in the Company.

5    Plaintiffs contend that this information should have been disclosed.

6          Plaintiffs next allege that unusual transactions conducted by Mr. Basile artificially and

7    materially inflated the Company's income and revenue.  Before the IPO, Violin Memory sold the

8    6000 Flash Arrays to J.P. Morgan and BofA Merrill Lynch in exchange for being selected as

9    underwriters for the Company's IPO.  (CAC ¶ 78.)  Plaintiffs argue that this transaction artificially

10   inflated Violin Memory's revenue as reported in the Registration Statement.  Plaintiffs contend that

11   in light of the unusual means by which the transactions were negotiated and the fact that it inflated

12   revenues, the Registration Statement should have disclosed the above information but failed to do

13   so.

14         Finally, Plaintiffs contend that the Registration Statement should have disclosed the

15   Company's non-cancelable purchase orders, which Plaintiffs argue was required by U.S. generally

16   accepted accounting principles ("GAAP").  (CAC ¶¶ 79, 81.)  Plaintiffs assert that Registration

17   Statement reported that, as of January 31, 2013, the Company had approximately $15.9 million of

18   outstanding purchase commitments to contract manufacturer and other vendors.  The Registration

19   Statement did not disclose the amount of outstanding purchase commitments as of July 31, 2013.

20   The next reported outstanding purchase commitments, as of October 31, 2013, disclosed that those

21   commitments were in excess of $85 million.  Plaintiffs contend that this negative trend was

22   material and that the figures as of July 31, 2013, should have been disclosed, and that the omitted

23   information would have been considered by reasonable investors in making their decisions to

24   purchase Violin Memory stock.  (CAC ¶¶ 83-86.)

25   **II.    DISCUSSION**

26        **A.    REQUESTS FOR JUDICIAL NOTICE**

27         In general, a court cannot consider materials outside the pleadings on a motion to dismiss

28   for failure to state a claim.  *See* Fed. R. Civ. P. 12(b).  A court may, however, consider items of

which it can take judicial notice without converting the motion to dismiss to one for summary

judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). A court may take judicial notice

of facts "not subject to reasonable dispute" because they are either "(1) generally known within the

territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort

to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Additionally, a

court may take judicial notice of "'matters of public record' without converting a motion to dismiss

into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.

2001) (quoting *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986)). Under the

incorporation by reference doctrine, courts may consider documents "whose contents are alleged in

a complaint and whose authenticity no party questions, but which are not physically attached to the

[plaintiff's] pleading." *In re Silicon Graphics Inc. Sec. Litig*., 183 F.3d 970, 986 (9th Cir. 1999)

(quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)) (alteration in original) (superseded

by statute on other grounds). Where a document is referenced or incorporated by reference into a

complaint, "[t]he court may treat such a document as 'part of the complaint'" and the Court "may

assume [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Marder

v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted).

Applying the "incorporation by reference" doctrine, the Court grants Defendants'

unopposed requests for judicial notice of (i) Violin Memory's Form A-1/A, filed with the SEC on

September 16, 2013; (ii) a transcript of Violin Memory's Q3 2014 Earnings Call from November

21, 2013; (iii) Violin Memory's Form 8-K, filed on November 21, 2013, and attached press release,

(iv) the Prospectus filed with the SEC on September 27, 2013; (v) Form S-1 filed with the SEC on

August 26, 2013; and (vi) the Sequester Order For Fiscal Year 2013 issued on March 1, 2013.

(Dkt. Nos. 63-1, 63-2–63-5, 63-6; 69-1, 69-2, 69-3; *see also* Dkt. Nos. 74 at 7; 75 at 4.)

Plaintiffs dispute Defendants' request for judicial notice of nine documents falling into four

categories: an SEC filing, analyst report, news articles, and court documents. The Court considers

each category in turn.

1    In the first category, Plaintiffs contest judicial notice of Violin Memory's SEC filing Form

2  10-K for fiscal year 2014, filed on April 16, 2014.[4]  (Dkt. No. 74 at 5-7.)  The Court grants judicial

3  notice of this document.  The April 2014 10-K, which post-dates the filing of this action, is

4  nowhere referred to in the CAC, but the substance therein relates to Plaintiffs' allegations that there

5  had been financial chicanery at play both with respect to disclosure of the Company's purchase

6  order commitments and GAAP compliance.  Moreover, public records, such as SEC filings, are

7  properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss in a

8  securities case.  *In re Extreme Networks, Inc. S'holder Derivative Litig.*, 573 F. Supp. 2d 1228,

9  1232 n.2 (N.D. Cal. 2008) (citing *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953–54 (N.D.

10  Cal. 2007); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)).

11  Accordingly judicial notice is **GRANTED**.

12    Second, Defendants seek judicial notice of a Deutsche Bank analyst report (Dkt. No. 69-5)

13  as relevant to their argument concerning loss causation.  Defendants argue that judicial notice is

14  appropriate, as the report relates to the relationship between disclosures made in the Earnings Call

15  and Press Release, subsequent analyst guidance and ultimate stock price decline, and information

16  that was provided to the market concerning the effect of the decline in sales to the federal

17  government.  Plaintiffs counter that this document is not relied upon in the complaint and the

18  information therein is redundant of other information of which the Court has taken judicial notice

19  insofar as it relates to what information the market reasonably knew at the time of the IPO.  (Dkt.

20  No. 74 at 7-8.)  The Court agrees.  Consideration of this document is not appropriate in this

21  procedural context.  Defendants' request for judicial notice is **DENIED**.

22    Third, Defendants seek judicial notice of certain court documents related to Mr. Basile's

23  termination from Fusion-io: a stipulation of dismissal, an order of dismissal, and a docket sheet.

24  (Dkt. Nos. 63-7, 63-8, 63-9.)  Federal courts may "take notice of proceedings in other courts, both

25  within and without the federal judicial system, if those proceedings have a direct relation to the

26  matters at issue."  *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F. Supp. 2d 1224,

---

27  
28    [4]    Plaintiffs do not contest judicial notice of the Form 10-Q, which is the subject of
Defendants' Supplemental Request for Judicial Notice.  (Dkt. No. 77-1.)  The Court **GRANTS**
judicial notice of this document.

1233 (E.D. Cal. 2003) (citing *United States ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).  Plaintiffs argue that these documents inappropriately dispute that Mr. Basile was terminated "for cause" and are therefore not appropriate for judicial notice.  The Court agrees.  Although documents related to judicial proceedings are generally deemed appropriate for judicial notice, here these documents are offered to dispute the factual merits of Plaintiffs' claim concerning the nature of Mr. Basile's termination.  Accordingly, the Court **DENIES** judicial notice of these documents.

Finally, Defendants seek judicial notice of news articles relating to the federal government slowdown to show what information was generally known to the public during the relevant time period.  Plaintiffs argue that because these articles do not pertain to Violin Memory directly, they are not properly subject to judicial notice.  For that, and other fundamental reasons, the Court agrees.  *Patel v. Parnes*, 253 F.R.D. 531, 549 (C.D. Cal . 2008) ("The numerous cases that discuss news articles as part of the 'total mix' of information available to investors address only articles about the defendant's activities and performance, not articles about an industry as a whole" (listing cases)).  Defendants' requests for judicial notice related to these documents is **DENIED**.

**B.    MOTIONS TO DISMISS**

**1.    Legal Standard**

The parties dispute whether Plaintiffs' CAC should be analyzed under the notice pleading standards of Rule 8 or the heightened pleading standards of Rule 9(b).  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Court addresses each standard in turn.

Whether the heightened standards of Rule 9(b) applies turns on the nature of the allegations, not the elements of the claim.  "Rule 9(b) applies to 'averments of fraud' in all civil cases in federal district court . . . in cases in which fraud is not an essential element of the claim, Rule 9(b) applies, but only to particular averments of fraud."  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  A plaintiff "may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity

United States District Court
Northern District of California

1    requirement of Rule 9(b)."  *Id.* at 1103–04.  A typical example of that situation is where a plaintiff

2    alleges that the same course of conduct constitutes both securities fraud under Section 10 as well as

3    a violation of Section 11.  In other cases, "a plaintiff may choose . . . to allege some fraudulent and

4    some non-fraudulent conduct.  In such cases, only the allegations of fraud are subject to Rule 9(b)'s

5    heightened pleading requirements."  *Id.* at 1104.

6        Section 11 claims are not inherently fraud-based even though they do require a

7    misrepresentation.  When grounded in fraud, "the particularity requirements of Rule 9(b) appl[ies]

8    to claims brought under Section 11."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir.

9    1996), *cert denied*, 520 U.S. 1103 (1997).  "Fraud can be averred by specifically alleging fraud, or

10   by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used).  *Vess*, 317

11   F.3d at 1105 (citations omitted).  "Under California law, the 'indispensable elements of a fraud

12   claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance,

13   and damages.'"  *Id.* (citations omitted).  Importantly, scienter is not required for claims under

14   Section 11; defendants may be liable under Section 11 for negligent or even innocent

15   misrepresentations.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (internal citations

16   omitted).

17       In their CAC, Plaintiffs argue that they do not advance a claim that sounds in fraud or a

18   unified course of fraudulent conduct.  *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534,

19   545 (N.D. Cal. 2009) (noting that where, as here, the plaintiff has *not* alleged that the same course

20   of conduct constitutes both a Section 11 violation and a violation of other laws necessarily

21   sounding in fraud such as Rule 10b–5, the "unified course of fraudulent conduct" test is essentially

22   circular and is therefore uninstructive).  Defendants counter that although fraud is not specifically

23   pleaded, the allegations in the CAC necessarily constitute fraud.  (VM Defs.' Mot. at 8 ("At its

24   core, the CAC alleges that the Violin Memory Defendants knew but failed to disclose material

25   negative information concerning its business, products and customers in connection with the

26   Company's IPO."); 10-11.)  Having examined the CAC, the Court agrees with Plaintiffs and finds

27

28

United States District Court
Northern District of California

1  that with one minor exception[5], the facts alleged do not "necessarily constitute fraud (even if the

2  word 'fraud' is not used)."  *Vess*, 317 F.3d at 1105 (citations omitted).

3          The CAC does not specifically allege fraud and avoids averments inherently suggestive of

4  fraud— *i.e.*, there is no allegation that defendants "knowingly" or "intentionally" concealed

5  information or made misrepresentations.  Although such allegations could be inferred, the

6  allegations in the CAC can equally support the inference that Defendants committed such

7  misrepresentations without any scienter.  Plaintiffs' factual allegations preset a plausible claim that

8  Defendants committed the misrepresentations and omissions negligently.  Plaintiffs have not

9  expressly pleaded fraud, and have pleaded non-fraud bases for liability.  Thus, the Court declines to

10  find that Plaintiff's CAC necessarily sounds in fraud.  *See In re Charles Schwab Corp. Sec. Litig.*,

11  257 F.R.D. at 546 (noting the paucity of Ninth Circuit published decisions finding that Rule 9(b)

12  applies to a Section 11 claim where, as here, the underlying conduct was not also alleged to have

13  constituted fraud).

14          In light of that finding, the Court will evaluate whether the Complaint states a claim for a

15  violation of Section 11 under Federal Rule of Civil Procedure 8.  Rule 8(a) requires that a plaintiff

16  _____

17  [5]        The only instance of a factual allegation that sounds in fraud occurs at CAC Paragraphs 76-
18  78, under the heading "The Registration Statement Failed to Disclose that Basile Artificially
   Inflated Sales of Violin Memory's 6000 Flash Arrays."  Plaintiffs assert that prior to the IPO,
19  Violin Memory sold the 6000 Flash Arrays to J.P. Morgan and BofA Merrill Lynch in exchange for
   being selected as underwriters for the Company's IPO.  The sales to J.P. Morgan and BofA Merrill
20  Lynch resulted in sizable product revenue gains for the Company in the first two quarters of fiscal
   2014, and therefore artificially inflated Violin Memory's revenue.  Given the unusual means by
21  which the transactions were negotiated, Plaintiffs allege that the Registration Statement should have
   disclosed the above information but failed to do so.  As further support, Plaintiffs argue that Item
22  303 of Regulation S-K (17 C.F.R. Part 229) required that the Registration Statement disclose
   unusual or infrequent transactions that materially affected reported income, and that the
23  Registration Statement failed to disclose or explain how Violin Memory in material part achieved
   the increase in product revenue.  The Court finds Plaintiffs to have essentially pleaded that Mr.
24  Basile "artificially inflated" the sales and orchestrated this "unusual" transaction and the resultant
   failure to disclose such transactions in the Registration Statement.  These allegations sound in
25  fraud, but nowhere does the CAC allege with any particularity facts concerning Mr. Basile's
   orchestration of these transactions or the decision to omit these details from the Registration
26  Statement.  Accordingly, Plaintiffs' allegations related to Mr. Basile's financial dealings with the
   underwriters are "disregarded," or "stripped from the claim," for failure to satisfy Rule 9(b).  *Vess*,
27  317 F.3d at 1105.

28

"'provide a 'short and plain statement of the claim showing that [he] is entitled to relief.'"  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)).  "This is not an onerous burden.  Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests."  *Id.* (internal quotation marks and citation omitted).  Nonetheless, the complaint is properly dismissed if it fails to plead "'enough facts to state a claim to relief that is plausible on its face.'"  *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008) (quoting *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544 (2007)).  In making this determination, a court must be mindful that

> a district court ruling on a motion to dismiss is not sitting as a trier of fact.  It is true that the court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences.  But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  That said, the Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1403.

### 2.    Count 1, Part 1: Section 11 Claim – Actionable Omissions

Section 11 of the Securities Act "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).  To state a claim under Section 11, plaintiffs must adequately plead "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d at 1027).  Section 11 is a strict liability statute that does not require fraudulent intent. *In re Daou Sys., Inc.*, 411 F.3d at 1027.  "A claim under Section 11 based on the omission of information must

demonstrate that the omitted information existed at the time the registration statement became effective." *Rubke*, 551 F.3d at 1164.  Moreover, where the adequacy of the disclosures is at issue, Defendants must make a "stringent showing" that "reasonable minds could not disagree" that the disclosures were not misleading.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 947 (9th Cir. 2005) (dismissal on the pleadings based on sufficient cautionary language "requires a stringent showing:  There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'").  The "materiality" of an omission is a fact-specific determination that should ordinarily be assessed by a jury.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 (citing *Fecht v. The Price Co.*, 70 F.3d 1078, 1080–81 (9th Cir.1995)).  "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* (citing *Fecht*, 70 F.3d at 1081).

The crux of Defendants' argument is that the alleged omissions that form the basis for Plaintiffs' Section 11 claim are, in fact, not actionable omissions either because they were contained in the Registration Statement or were in the public domain at the time of Violin Memory's IPO.  In essence, Defendants contend that none of the statements with which Plaintiffs take issue are actionable because the CAC lacks allegations to support an inference that they were either false or misleading as a matter of law.  The Court considers each category of Plaintiffs' allegations in turn, as outlined on Pages 5-6, *supra*.

### a.  Statements About PCIe Cards

Plaintiffs argue that there are five misrepresentations relating to PCIe Cards.  (Opp. at 10-12.)  The relevant excerpts from the Amended Registration Statement including the alleged misrepresentations include:

- Our Velocity Peripheral Component Interconnect Express, or PCIe, Flash Memory Cards leverage our persistent memory-based architecture in servers and are optimized for applications that require continuous access to large quantities of low latency persistent memory located directly in servers. We have demonstrated that our persistent memory-based storage solutions provide low latency and sustainable performance with enterprise-class reliability, availability and serviceability through product testing and customer feedback.

Our solutions enable customers to realize significant capital expenditure and operational cost savings by simplifying their data center environments.  (Dkt. No. 69-1 at 78.)

- Our Flash Memory Arrays integrate enterprise-class hardware and software technologies to cost-effectively address the limitations of other storage solutions. Our storage systems are based on a four-layer hardware architecture which is tightly integrated with our Violin Memory Operating System, or vMOS, software stack to optimize the management of flash memory at each level of our system architecture. In March 2013, we expanded our innovation in persistent memory technologies and proprietary techniques in flash management from our memory arrays to our Velocity PCIe Flash Memory Cards. Our Velocity PCIe Flash Memory Cards leverage our expertise in persistent memory-based storage and controller design, as well as our vMOS software stack, to offer a differentiated architecture in a widely deployable PCIe form factor.   (Dkt. No. 69-1 at 1, 78.)

- ***Our products are highly technical and may contain undetected defects, which could cause data unavailability, loss or corruption that might, in turn, result in liability to our customers and harm to our reputation and business.***
  Our Flash Memory Array and Velocity PCIe Flash Memory Card products and related software are highly technical and complex and are often used to store information critical to our end-customers' business operations. Our products may contain undetected errors, defects or security vulnerabilities that could result in data unavailability, loss or corruption or other harm to our end-customers. Some errors in our products may only be discovered after they have been installed and used by end-customers. Any errors, defects or security vulnerabilities discovered in our products after commercial release, or any perception of the same in the marketplace, could result in a loss of revenue or delay in revenue recognition, injury to our reputation, a loss of end-customers or increased service and warranty costs, any of which could adversely affect our business.  (Dkt. No. 69-1 at 17 (emphasis in original).)

- Factors that are difficult to predict and that could cause our operating results to fluctuate include:
  [. . .]
  - the degree to which our Velocity PCIe Flash Memory Cards gain market
    acceptance.  (Dkt. No. 69-1 at 15.)

- ***If our Velocity PCIe Flash Memory Cards do not gain market adoption or sales of our Velocity PCIe Flash Memory Cards grow more slowly than anticipated, we may not be able to increase our revenue sufficiently to achieve and maintain profitability.***

1

2

3

4

5

We have devoted a significant amount of resources to developing and marketing our Velocity PCIe Flash Memory Cards and believe our future growth will substantially depend on the market acceptance and adoption of this new product. Because we are strategically targeting the PCIe memory card market and expending a considerable amount of resources in doing so, if our Velocity PCIe Flash Memory Cards do not gain market acceptance, our results of operations, business and prospects would be materially and adversely affected. (Dkt. No. 69-1 at 19.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The core of Plaintiffs' argument is that problems existed at the time of the IPO and the Registration Statement's presentation of such problems as mere possibilities was inaccurate and misleading.[6] (CAC ¶¶ 32-35; 38-45.)  Specifically, Plaintiffs allege that the Registration Statement failed to disclose material defects and development problems regarding the PCIe Cards that had materialized prior to the IPO.  Plaintiffs assert that although the Registration Statement represents that the Company had already "optimized" its PCIe Cards and had already "demonstrated" their capabilities through "product testing and customer feedback," and that it had already expanded its innovation in flash memory to the new line of PCIe Cards that "leverage" its "expertise," when in reality, the PCIe Cards were "not optimized or sustainable" because of numerous "material technical and engineering defects," including inoperable firmware, reliance on hardware instead of supporting components, difficulties associated with repairing hardware, unexpected shutdowns, and power disruptions.  (CAC ¶¶ 34, 37.)  Plaintiffs take further issue with the statement that the PCIe Cards "may contain undetected errors, defects or security vulnerabilities," (CAC ¶ 33), arguing that this representation was untrue because it represents that the only material errors, defects, or security vulnerabilities suffered by the PCIe Cards were undetected, *i.e.*, there were no present material errors or defects.  Plaintiffs also contend that the statement that "the degree to which [its] [PCIe Cards] gain market acceptance" is "difficult to predict" and could cause "operating results to fluctuate" was misleading because "[t]he PCIe Cards had already been offered to and rejected by the market."  (CAC ¶¶ 39, 45.)  According to Plaintiffs, the Registration Statement represented that the Company had "devoted a significant amount of resources to developing and marketing [its]

27

28

_____

[6]     Plaintiffs expressly disclaim that their claims concerning PCIe Cards should have been disclosed pursuant to Item 303 of Regulation S-K.  (Opp. at 11 n.13.)

[PCIe Cards]"; that the Company's "future growth will substantially depend on the market acceptance and adoption of this new product"; and that "if [the PCIe Cards] do not gain market acceptance, [the Company's] results of operations, business and prospects would be materially and adversely affected."  (CAC ¶ 40.)  Plaintiffs contend that such representations are "untrue" because they are framed as contingencies rather than actualities.  In reality, Plaintiffs assert, the PCIe Cards had already proven unsaleable and obsolete by the time the Registration Statement became effective.  (CAC  ¶¶ 41-45.)

Defendants contend that none of Plaintiffs' identified representations qualify as material omissions or misrepresentations because the Registration Statement contained adequate risk disclosures and cautionary language regarding PCIe Cards.  In particular, Defendants argue that the Registration Statement's representations concerning PCIe Cards were framed as possibilities; *e.g.*, that there may be "undetected" errors or defects, or that "if" the PCIe Cards "do not gain acceptance" the investors stood to lose, and cannot overcome the heavy weight of the myriad disclosures in the Registration Statement.

The Court agrees.  "[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies."  *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) (discussing cases).  "Rather, to be actionably misleading, an omission 'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'"  *In re Ubiquiti Networks*, 2014 WL 1254149, at *10 (N.D. Cal. March 26, 2014) (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Here, the Registration Statement contained numerous disclosures regarding the highly technical nature of the Flash Arrays and PCIe Cards, including explicit disclosures that the PCIe Cards may contain undetected defects, and that the PCIe Card was a new product for which the Company had derived no meaningful revenue as of the IPO, and *might never generate revenue*.  Given these disclosures, Plaintiffs cannot be heard to complain that the disclosures were inadequate.  For example, the Company disclosed:

18

- We only recently introduced our Velocity PCIe Memory Card solutions in March 2013 and have not derived significant revenue from the sale of these solutions to date.  (Dkt. No. 69-1 at 1-2.)

- Our Flash Memory Array and Velocity PCIe Flash memory Card products and related software are highly technical and complex and are often used to store information critical to our end-customers' business operations. Our products may contain undetected errors, defects or security vulnerabilities that could result in data unavailability, loss or corruption or other harm to our end-customers. Some errors in our products may only be discovered after they have been installed and used by end customers. Any errors, defects or security vulnerabilities discovered in our products after commercial release, or any perception of the same in the marketplace, could result in a loss of revenue or delay in revenue recognition, injury to our reputation, a loss of end-customers or increased service and warranty costs, any of which could adversely affect our business.  (*Id*. at 17.)

- ***If our Velocity PCIe Flash Memory Cards do not gain market adoption or sales of our Velocity PCIe Flash Memory Cards grow more slowly than anticipated, we may not be able to increase our revenue sufficiently to achieve and maintain profitability***.  (*Id*. at 19 (emphasis in original).)

     The Company further explained that developing the PCIe Cards was a time intensive and expensive process, explaining that "our investments in research and development . . . may result in products that are more expensive than anticipated, take longer to generate revenue or generate less revenue, if at all, than we anticipate. . . . we may not receive significant revenue from these investments in the near future, if at all." (*Id*. at 21.)  The Registration Statement warned that the PCIe Cards "may never gain broad adoption." (*Id*. at 19.)  In fact, some of the purported omissions with which Plaintiffs take issue were specifically disclosed in the Registration Statement.   For example, Plaintiffs allege that the Company omitted "software incompatibility problems"  (CAC ¶ 51) when the Registration Statement disclosed that "our products must interoperate with network interfaces such as . . . software applications and hardware developed by others, and if we are unable to ensure that our products interoperate with such software and hardware, we may . . . experience reduced demand for our products."  (Dkt. No. 69-1 at 20.)

     Under the facts alleged in the CAC, viewed in a light most favorable to Plaintiffs, and giving due consideration to the facts provided in the Registration Statement, the Court finds that no

19

United States District Court
Northern District of California

reasonable investor could have been misled regarding the high degree of risk involved in the purchase of Violin Memory stock.  The Company's myriad comprehensive and specific disclosures relating to the PCIe Cards make clear that the statements with which Plaintiffs take issue, *even if* construed as Plaintiffs allege, did not "alter the mix" of information such that they could reasonably be understood as misleading, much less materially misleading.

Defendants' motion as to this category of allegations is **GRANTED**.

### b.  Statements About the Company's work with Toshiba

Plaintiffs also contend that the Registration Statement failed to disclose "material difficulties building and developing the PCIe Cards in accordance with Toshiba's specifications." (CAC ¶¶ 36, 37.)  Plaintiffs offer no specific factual allegations concerning what those "material difficulties" were.  Regardless, the Registration Statement is sufficiently clear about the Company's relationship with Toshiba and the status of the PCIe Cards development to render Plaintiffs' bald "material difficulties" allegation immaterial.

The language in the Registration Statement that Plaintiffs contend is misleading is contained in the following excerpts:

- In March 2013, we expanded our innovation in persistent memory technologies and proprietary techniques in flash management from our memory arrays to our Velocity PCIe Flash Memory Cards. Our Velocity PCIe Flash Memory Cards leverage our expertise in persistent memory-based storage and controller design, as well as our vMOS software stack, to offer a differentiated architecture in a widely deployable PCIe form factor. Additionally, we believe our relationship with Toshiba, a leading provider of flash memory and one of our principal stockholders, allows us to design our systems to unlock the inherent performance capabilities of flash technology and enables us to develop around new generations of flash memory rapidly. (Dkt. No. 69-1 at 1.)

- In July 2013, we entered into a PCIe Card Development Agreement with Toshiba, pursuant to which we will develop a derivative product to our Velocity PCIe Flash Memory Card which complies with Toshiba's specifications and sell sample PCIe cards to Toshiba. Pursuant to this agreement, Toshiba paid us $16 million. The $16 million payment consisted of $8 million for our services to be performed for the development of the PCIe cards, and $8 million for our sale of sample PCIe cards to Toshiba and related support services. If we are not able to meet the milestones described in the

agreement, we must refund the amount attributed to undelivered goods and services by September 15, 2014.  (Dkt. No. 69-1 at 119.)

To the extent that Plaintiffs contest any forward-looking statements ("we believe our relationship with Toshiba" or "we will develop"), the Court finds that the "bespeaks caution" doctrine "'provides a mechanism by which [it] can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.' "  *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1408 (citing *Fecht*, 70 F.3d at 1081).  By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements.  However, the Ninth Circuit has observed that the doctrine "merely represents the pragmatic application of two fundamental concepts in the law of securities fraud: materiality and reliance."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994).  Again, based on the Registration Statement's extensive and specific disclosures, the Court finds that no reasonable investor would have considered any of Plaintiffs' alleged misstatements or omissions material.

The Registration Statement discloses the early stage and hurdles of the PCIe Card development process both as a general matter (as explained above) and specifically with respect to the Toshiba deal.  (Dkt. No. 69-1 at Ex. 10.23.)  This agreement reflects that Toshiba had not agreed to purchase any PCIe Cards and would reject the Cards if certain milestones were not met.  (*Id.* at Ex. 10.23 p. 4-5 (stating that if "Toshiba rejects the Developmental Samples, Toshiba shall promptly notify Violin …".)  Violin Memory also related the attendant risks, including the obligation to pay damages in the event that it failed to satisfy Toshiba's requirements.  (*Id.* ("If Violin has not been able to deliver the Developmental Samples for each Product by August 31, 2014, then, unless [otherwise] agreed … Violin shall reimburse to Toshiba the Individual Developmental Service fee for each such Product that is in delay … as liquidated damages …").)  The Registration Statement informed investors that Toshiba's acceptance or purchase of any PCIe Cards was not guaranteed, and the attachment to the Registration Statement related that "any potential deliverables that might be included in [a future] Agreement are ***contingent deliverables that are dependent upon the successful development and completion of the PCIe cards under the***

*current development agreement for which there is substantive uncertainty*." (*Id.* at F-27

(emphasis supplied).)  Given these extensive and substantive disclosures, Plaintiffs' contention that

the Registration Statement in some way misrepresented the nature of the deal with Toshiba or the

Company's development of the PCIe Cards for that purpose fall short.  Again, even construing

Plaintiffs' alleged omission in a light most favorable to them, this cannot overcome the great

weight of the Registration Statement's disclosures.  Defendants' motion as to these allegations is

**GRANTED**.

### c.   Statements About the 6000 Flash Arrays

Plaintiffs allege three misrepresentations concerning the 6000 Flash Arrays, which turn on

Defendants' alleged failure to disclose material defects with this product.  Relevant excerpts of the

Amended Registration Statement including these alleged misrepresentation are as follows:

- Our Flash Memory Arrays integrate enterprise-class hardware and software technologies to cost effectively address the limitations of other storage solutions. Our storage systems are based on a four-layer hardware architecture which is tightly integrated with our Violin Memory Operating System, or vMOS, software stack to optimize the management of flash memory at each level of our system architecture.  (Dkt. No. 69-1 at 1.)

- ***Our products must interoperate with network interfaces, such as operating systems, software applications and hardware developed by others, and if we are unable to ensure that our products interoperate with such software and hardware, we may fail to increase, or we may lose, market share and we may experience reduced demand for our products.***
  Our storage products comprise only a part of a datacenter's infrastructure. Accordingly, our products must interoperate with our end-customers' existing infrastructure, specifically their networks, servers, software and operating systems, which are typically manufactured by a wide variety of systems vendors. When new or updated versions of these software operating systems or applications are introduced, we must sometimes develop updated versions of our software so that our products interoperate properly. We may not accomplish these development efforts quickly, cost-effectively or at all.  (*Id.* at 20 (emphasis in original).)

- Our Flash Memory Array and Velocity PCIe Flash Memory Card products and related software are highly technical and complex and are often used to store information critical to our end-customers' business operations. Our products may contain undetected errors, defects or security vulnerabilities that

> could result in data unavailability, loss or corruption or other harm to our end-customers. Some errors in our products may only be discovered after they have been installed and used by end-customers. (*Id.* at 17.)

Plaintiffs argue that the representation that the 6000 Flash Arrays already "integrate enterprise-class hardware and software technologies" and that the Company's "four-layer hardware architecture" and "software stack" already "optimize the management of flash memory . . . ," (CAC ¶ 46), was untrue because there were ongoing "material negative developments and engineering defects," (CAC ¶ 47). Second, Plaintiffs take issue with the Registration Statement's claim that the Company "must sometimes develop updated versions" of its "software so that [its] products interoperate properly," but that the Company "may not accomplish these development efforts quickly, cost-effectively or at all." (CAC ¶ 48.) Plaintiffs assert that this statement is misleading because the 6000 Flash Arrays had already been experiencing engineering defects with regard to the "controller cards," a general "inability to develop data management software," "incompatibility problems," and "delays in developing a software system enabling Company customers to utilize products without "experiencing low throughput . . .." (CAC ¶ 51.) Third, Plaintiffs challenge the Registration Statement's claim that the Company's 6000 Flash Arrays "may contain undetected errors, defects or security vulnerabilities" and that these errors, defects, and security vulnerabilities "could result in a loss of revenue or delay in revenue recognition . . . ." (CAC ¶ 49.) Plaintiffs contend that these statements are misleading due to the already realized software operability problems described above and argue that these problems "resulted in lost sales" and Defendant Basile's admission that "additional optimizations [had] delayed [the Company's] revenue." (CAC ¶¶ 50-52.) Defendants counter that the Registration Statement contained disclosures that warned investors that problems might arise, and that if so, revenues would likely be impacted.

For the reasons stated above, the Court finds that the Company disclosed myriad comprehensive and specific information regarding the nature of these products as complex and highly technical, and that all of its products including the 6000 Flash Arrays were susceptible to defects and vulnerabilities. Indeed, the alleged misrepresentations Plaintiffs identify are *embedded within* certain relevant disclosures. (*See* Dkt. No. 69-1 at 17.) It was no mystery that the risks

1  relative to the 6000 Flash Arrays could have a substantial effect on revenue.  The Registration

2  Statement related that at the time of the IPO, *substantially all* of the Company's revenue was

3  derived from the Flash Memory Arrays.  (Dkt. No. 69-1 at 19.)   For the six months ended July 31,

4  2012, sales of the 6000 Series Flash Memory Arrays represented approximately 84% of the

5  Company's product revenue, and over the next year rose to 91%.  (*Id.* at 53.)  To the extent that

6  Plaintiffs contend that a defect existed at the time of the IPO, that fact, even if true, cannot

7  overcome the great weight of the disclosures that specifically disclosed the likelihood that errors or

8  defects would be discovered after the IPO.  (*See id.* at 17 ("Some errors in our products may only

9  be discovered after they have been installed and used by end-customers.").)  At bottom, the risk

10  disclosures were sufficiently comprehensive to cover defects that both preceded and post-dated the

11  IPO, and adequately warned investors that any error could result in marked revenue decline.

12  Accordingly, the Court finds that reasonable minds could not disagree as to the lack of materiality

13  of Plaintiffs' alleged misrepresentations and omissions, even accepting those allegations in the light

14  most favorable to Plaintiffs.  Defendants' motion to dismiss on this ground is GRANTED.

### d.  Statements About the Company's Government Contracts

16       Plaintiffs allege that the Registration Statement should have disclosed all information

17  required under the SEC rules, and that this includes a "trend" relating to the decline of the

18  Company's federal government sales and the effect of federal sequestration.  Plaintiffs assert that

19  the Registration Statement should have disclosed this material negative trend but failed to do so,

20  and the Defendants therefore violated Item 303 of Regulation S-K.  Specifically, Plaintiffs allege

21  that in the months leading up to the IPO, the federal government sales had been declining and

22  materially impacting revenues.  (CAC ¶¶ 57-64.)  The Registration Statement allegedly failed to

23  reflect accurately this trend, instead indicating that the Company was undertaking to "increase the

24  sales to government customers."  (CAC ¶ 54.)  Plaintiffs also allege facts which, when taken as true

25  and construed in a light favorable to Plaintiffs, establish that the decline in government sales was

26  reasonably likely to have an unfavorable impact on net sales or revenues.  (*See* CAC ¶¶ 57-64.)

27       Item 303 requires disclosure of "any known trends or uncertainties that have had or that the

28  registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

24

United States District Court
Northern District of California

1    revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  The Ninth Circuit

2    has held that because Section 11 imposes liability if a registrant "omits to state a material fact

3    required to be stated" in the registration statement, "any omission of facts 'required to be stated'

4    under Item 303 will produce liability under Section 11."  *Steckman v. Hart Brewing*, 143 F.3d

5    1293, 1296 (9th Cir. 1998).

6          Defendants counter that disclosures in the Registration Statement were sufficient and that

7    any trends would have been publicly known.  That the federal government shut down in 2011 had

8    profound results on the markets was widely and publicly known.  (*See* Fed. R. Evid. 201(b); *see*

9    *also* Dkt. No. 63-6, Sequester Order for Fiscal Year 2013.)  However, at this early stage, the Court

10   is not prepared to declare that reasonable minds could not disagree that there was no "trend" as

11   defined in Item 303 as of the date of the IPO for which disclosure was required as a matter of law.

12         Defendants' argument that the crux of Plaintiffs' allegations is a claim that the Registration

13   Statement should have disclosed a *future* trend projection, as opposed to a then-present trend, is

14   belied by the allegations in the CAC.  Plaintiffs allege that in the months leading up to the IPO,

15   there was a material negative trend related to federal government sales that should have been

16   disclosed pursuant to Item 303.  (CAC ¶¶ 57-64.)  There remains a narrow question as to whether in

17   the months leading up to the IPO, federal sales had declined such that there was a "trend" as

18   required for disclosure under Item 303.  Defendants' motion to dismiss on this ground is **DENIED**.

19                      **e.  Statements About Donald Basile's Former Employment**

20         The CAC alleges omissions relating to the business experience and background of

21   Violin Memory's former CEO, Defendant Basile.  Basile served as the CEO of Fusion-io, a

22   competitor to Violin Memory in the flash memory industry, prior to joining Violin Memory in

23   2009.  (CAC ¶ 12.)  According to Plaintiffs, Fusion-io terminated Basile "for cause."  (CAC ¶ 73.)

24   Because Basile's employment agreement with Fusion-io lists five different grounds for a "for

25   cause" termination, all of which relate to his job performance to varying degrees of ethical severity,

26   Plaintiffs assume that one of those grounds formed the basis for Basile's termination.  Plaintiffs

27   further argue that no matter which ground or grounds served as the basis for Basile's termination, it

28   should have been disclosed in the Registration Statement because each basis speaks to his

25

United States District Court
Northern District of California

1  background and competence and all are negative.  (CAC ¶ 74.)  Pursuant to Item 401 of Regulation

2  S-K (17 C.F.R. § 229.401(e)(1)), the Registration Statement should have disclosed the omitted

3  material information relating to Basile's "for-cause" termination because it related to his

4  "responsibilities in prior positions, overall professional competence, experience, qualifications,

5  attributes, and skills to serve as [a] director[] and officer[] of a start-up publicly traded company,"

6  and would have been considered by the public when deciding to invest.  (CAC ¶ 75.)  Plaintiffs

7  assert that the omitted information rendered the representations concerning Mr. Basile's credentials

8  misleading, and that such information was material to a reasonable investor's decision to purchase

9  Violin Memory stock.

10  Defendants argue that the "for cause" termination was the substance of a civil lawsuit that

11  had been made part of the public record and that had resolved in a voluntary dismissal before the

12  case was ever decided on the merits.  (Dkt. No. 61 at 16.)  They thus contend that there was no duty

13  to disclose the lawsuit or the allegations therein, and there was no way these facts could be material

14  or "of any interest to a reasonable investor."  (*Id.*)

15  The Court disagrees.  The allegations in the CAC, taken as true and construed in Plaintiffs'

16  favor, plausibly state that the reasons given for Mr. Basile's termination were material to a

17  reasonable investor's decisionmaking with respect to purchasing Company stock.  Defendants

18  argue that Plaintiffs do not identify any applicable duty requiring disclosure of "additional details"

19  concerning Mr. Basile's prior employment with Fusion-io, but that is not so.  The regulation

20  requires disclosure of Mr. Basile's prior work experience and competence, and his "for cause"

21  termination was relevant.  Thus, Plaintiff has alleged that there was a duty to disclose, and the

22  Court finds that a reasonable investor could have considered the omitted information material.

23  Moreover, Defendants' argument concerning the voluntary dismissal of the related civil action

24  against Mr. Basile again begs the question of whether that fact is sufficient to render the alleged

25  omission immaterial.  At this early juncture, construing the facts alleged in Plaintiffs' favor, the

26  Court cannot find that no reasonable investor could have had an interest in knowing that Mr. Basile

27  had been terminated "for cause" from his position as CEO of Fusion-io.  Defendants' motion to

28  dismiss on this ground is **DENIED**.

United States District Court
Northern District of California

### f.   GAAP violation regarding purchase order commitments

Plaintiffs allege that as of July 31, 2013, the Company failed to disclose the amount of non-cancelable purchase orders for commitments that had a remaining term in excess of one year as of the date of the latest balance sheet presented.  Plaintiffs claim that this violated GAAP, specifically FASB Codification 440-10-50-2 and 440-10-50-4.  (CAC ¶¶ 81, 82.)  Plaintiffs further allege that in the Company's report for the quarter ended October 31, 2013, filed with the SEC on Form 10-Q, Violin Memory disclosed that purchase commitments were in excess of $85 million, including non-cancelable purchase orders, an increase from January 31, 2013, of approximately 435%.[7]  Plaintiffs reason that this constitutes a material negative trend from January 31, 2013, through October 31, 2013, and that it is highly unlikely that the Company did not have any unconditional purchase obligations as of July 31, 2013.  Plaintiffs conclude that the amount of outstanding purchase orders leading up to the IPO would have been considered by reasonable investors in making their decisions to purchase Violin Memory stock.  Thus, they contend that the failure by Violin Memory to disclose the amount of non-cancelable purchase commitments caused the Registration Statement and, in particular the July 31, 2013, financial statements, to be misleading and in violation of GAAP.

As an initial matter, "[a]s with any alleged misrepresentation, GAAP violations should generally be more than 'minor or technical in nature' and 'constitute[] widespread and significant inflation'" to give rise to securities law liability.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197-98 (C.D. Cal. 2008) (dismissing Section 10(b) claim against auditor despite alleged GAAP violations).  Moreover, closer inspection of the Company's SEC filing appears to belie Plaintiffs' claimed 435% increase.  The purchase orders disclosed as of January 2013 were approximately $60,000 and in October had increased to approximately $85,000.  (*Compare* Dkt. No. 69-1 at 64, *with* Dkt. No. 77-1 at 26.)[8]  Accordingly, Plaintiffs have alleged no plausible facts,

---

[7]     The Court notes that in their Opposition brief, Plaintiffs offer no citation to the documentary record to substantiate these figures.  Rather, Plaintiffs cite to paragraphs in their CAC, which as noted above, also contains no citation to the Registration Statement documents.

[8]     As noted above, Plaintiffs do not contest Defendants' filing of a supplemental request for judicial notice to include the SEC filing form 10-Q ending October 31, 2013.  However, rather than

United States District Court
Northern District of California

1    as opposed to mere conclusions, to show how disclosure of purchase order commitments as of July

2    31, 2013, would have materially altered the "total mix" of information available to investors.  *Basic*

3    *Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Defendants' motion to dismiss on this ground is

4    **GRANTED**.

5              **3.       Count 1, Part 2:  Section 11 Claim – Loss Causation**

6              As part of its overall analysis, district courts have dismissed Section 11 claims on the

7    pleadings where it was apparent on the face of the complaint that the plaintiffs would be unable to

8    establish loss causation.  *See, e.g., In re DNAP Sec. Litig.*, 2000 WL 1358619, at *3 (N.D. Cal.

9    2000).  The federal securities laws provide a private right of action to shareholders "to protect them

10   against those economic losses that misrepresentations actually cause," "not to provide investors

11   with broad insurance against market losses."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345

12   (2005).  Such causal losses occur when the share price falls significantly *after* the truth about the

13   untrue statements or misleading omissions becomes known.  *Id.* at 347; *In re Daou Sys.*, 411 F.3d at

14   1027 (explaining that damages are recoverable under the federal securities laws when the

15   shareholders' economic loss from the decline in their stock value was the direct result of alleged

16   misrepresentations).

17             In a Section 11 securities case, plaintiffs need not allege loss causation, that is, the plaintiffs

18   need not allege that the misrepresentations in the registration statement caused the plaintiffs' loss.

19   Rather, *the defendants* may prove as an affirmative defense that the plaintiffs' loss, or some portion

20   thereof, was not caused by the alleged misstatements or omissions.  Defendants argue that this case

21   warrants dismissal on this ground.

22

23

24   filing a motion for leave to file a sur-reply to address the merits of Defendants' reply arguments
     concerning the import of this document, Plaintiffs have included substantive argument regarding
25   Defendants' new arguments in their "Reply Re Motion to Strike" (which, for reasons stated above,
     the Court has construed as a brief in opposition to Defendants' Request for Judicial Notice).  (Dkt.
26   No. 79 at 10-11.)  The inclusion of such argument in a brief purporting to address only whether the
     Court should take judicial notice of certain documents is improper.  Accordingly, the Court has
27   considered arguments made therein relative to only whether judicial notice can properly be taken.
     Plaintiffs' substantive argument regarding the Form Q-10 is **STRICKEN**.
28

As courts in other circuits have explained, a plaintiff may establish loss causation by alleging simply "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005) (citation omitted; emphasis in original). That is, the loss must be caused by the "materialization of the concealed risk." Thus, "in order '[t]o plead loss causation, the complainant must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.'" *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 547 (citing *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 359 (D. Md. 2008) (citations omitted)).

As detailed above, all but two of Plaintiffs' claimed misstatements and omissions are undermined by disclosures in the Registration Statement and thus play no part in the instant analysis. First, with respect to the failure of the Registration Statement to include a trend pursuant to Item 103 related to the declining federal sales, the CAC alleges that Plaintiffs suffered losses when the stock price dropped following the November 21 Press Release and Earnings Call. (CAC ¶¶ 2, 62.) In the Press Release and on the Earnings Call, the Company revealed the disappointing quarter results and attributed the results to a decline in government contract revenues. (*See* CAC ¶¶ 2, 62; Dkt. No. 69-2 at 2, 4 and 5.) Given this link, the Court cannot say that Plaintiffs would not be able to establish loss causation. Defendants' motion to dismiss on this ground is **DENIED**.

However, with respect to the misstatement concerning Mr. Basile's prior employment experience, Plaintiffs' CAC lacks any allegation that this misstatement is related to the loss they purportedly suffered. Accordingly, Defendants' motion to dismiss this theory of Section 11 liability is **GRANTED,** but with leave to amend.

### 4.    Section 12(a)(2) Claim Against Underwriter Defendants

To state a claim under Section 12(a)(2) against the Underwriters, Plaintiffs must allege that the Underwriters were "sellers" within the meaning of the statute. Under Section 12(a)(2), "any

person who offers or sells a security" by means of a "prospectus or oral communication" that is materially false or misleading is liable "to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).  The Supreme Court has defined "seller" as "the owner who passed title," or a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner" — *i.e.*, a broker.  *Pinter v. Dahl*, 486 U.S. 622, 642, 647; *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989) (applying *Pinter*'s definition of seller to a Section 12(a)(2) claim and affirming dismissal for failure to allege defendants "played any role at all in soliciting the purchases"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as a 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").  "Generally, issuers and underwriters are not sellers within the meaning of Section 12 unless they actively participate in the negotiations with the plaintiff/purchaser."  Thomas Lee Hazen, *The Law of Securities Regulation* § 7.6[1] (5th ed. 2006); *see also Foster v. Jesup & Lamont Sec. Co.*, 759 F.2d 838, 845–46 (11th Cir. 1985) (observing "[t]he fact that Congress made every underwriter liable in § 11, but not in § 12, suggests that underwriters are not to be liable under § 12 solely by virtue of their status as underwriters"; rather, there must be a showing of "active involvement in bringing about the buy-sell transaction"), *abrogated on other grounds by Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1525–28 (11th Cir. 1991).  "[I]t seems quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller*.  That is to say, in the case of the typical firm commitment underwriting, the ultimate investor can recover only from the dealer who sold to him or her."  *Rosenzweig*, 332 F.3d at 871 n.11 (quotation omitted).  Plaintiffs must "show that the defendants solicited purchase of the securities for their own financial gain."  *Pinter*, 486 U.S. at 647; *In re Daou Sys.*, 411 F.3d at 1029.  "Mere participation" in a solicitation or sale does not suffice.  *Pinter*, 486 U.S. at 650.  A plaintiff must allege that the defendants "had some 'direct' role in the solicitation of the plaintiff."  *Charles Schwab*, 257 F.R.D. at 549 (citing *In re Daou Sys.*, 411 F.3d at 1029) (finding 12(a)(2) liability where underwriters had signed the registration documents, allegedly participated in the distribution of the fund's shares; offered, sold, and actively solicited the sale of the fund's shares, and certain of the underwriters "participated in the written or oral

communications used to market the fund" or otherwise "participated in the marketing of the fund.").

Defendants argue that the Complaint does not allege that Shehk or Richards obtained title to the securities directly from any of the Underwriters. Defendants concede that there is one allegation that Richards "bought common stock . . . directly from J.P. Morgan" (CAC ¶ 9), but argue that other than this one conclusory statement, Plaintiffs do not allege any facts to establish that Underwriters actively and directly solicited, communicated with, or negotiated with Plaintiffs in connection with their stock purchases. The Court agrees. The CAC contains no allegation that the Underwriters actively solicited any Plaintiff, either named or class members, for sales of the Violin Memory stock. Even with respect to Richards, who allegedly "bought" "directly from" an underwriter, there are no allegations concerning the nature of that sale or that purport to depict J.P Morgan – much less any of the other underwriters – as having "solicited purchase" of the securities for their own financial gain. That four of the Underwriters "served as a joint book-running manager and as a representative of the underwriters for the IPO" (CAC ¶¶ 21–24), without more, does not suffice.

Accordingly, because the Complaint fails to allege facts sufficient to make plausible their claim that that Underwriters constituted "sellers" within the meaning of Section 12(a)(2), Plaintiffs have failed to assert standing as to this claim. Defendants' motion to dismiss this claim is **GRANTED** with leave to amend.

### 5.    Section 15 Claim Against Individual Defendants

Section 15 of the Securities Act of 1933 imposes joint and several liability upon every person who controls any person liable under Sections 11 or 12 of the Act. 15 U.S.C. 77*o*; *In re Daou Sys., Inc.*, 411 F.3d at 1029–30. To state a control person claim, plaintiff must establish (1) a primary violation of the pertinent federal securities laws, and (2) that defendants exercised actual power or control over the primary violator. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Plaintiffs' Section 15 claim is predicated on their alleged Section 11 claims. *In re Harmonic, Inc. Sec. Litig.*, 163 F. Supp. 2d 1079, 1085 (N.D. Cal. 2001).

United States District Court
Northern District of California

1    Here, because Plaintiffs have not pleaded an underlying violation of Section 11 under most

2 of their theories, their control person claim against the Individual Defendants as to these same

3 theories fails and must be dismissed.  *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080,

4 1105 n. 24 (C.D. Cal. 2003).  However, as to the remaining theory for Section 11 liability – the

5 omission of a trend required to be disclosed pursuant to Item 303 – Plaintiffs have alleged sufficient

6 factual allegations to permit this claim to move forward.

7 **III.    CONCLUSION**

8    For the reasons stated above, the Court **ORDERS** as follows:

9    1.  Defendants' requests for judicial notice are **GRANTED** in part;

10    2.  Plaintiffs' motion to strike is **GRANTED** in part;

11    3.  Plaintiffs' Section 11 claim based on statements about PCIe Cards is **DISMISSED**;

12    4.  Plaintiffs' Section 11 claim based on statements about the Company's work with

13       Toshiba is **DISMISSED**;

14    5.  Plaintiffs' Section 11 claim based on statements about the 6000 Flash Arrays is

15       **DISMISSED**;

16    6.  Defendants' motion to dismiss Plaintiffs' Section 11 claim based on statements about

17       the Company's government contracts is **DENIED**;

18    7.  Defendants' motion to dismiss Plaintiffs' Section 11 claim based on statements about

19       the Donald Basile's former employment is **DENIED**, and Plaintiffs shall have leave to

20       amend to address loss causation;

21    8.  Plaintiffs' Section 11 claim based on alleged GAAP violations is **DISMISSED**;

22    9.  Defendants' motion to dismiss Plaintiffs' Section 12(a)(2) claim is **GRANTED** with leave

23       to amend; and

24    10. Plaintiffs' Section 15 claim is **DISMISSED** in part.

25    This terminates Docket Numbers 61, 66, and 74.

26    **IT IS SO ORDERED**.

27 Date: **October 31, 2014**
                                            _____
28                                          **YVONNE GONZALEZ ROGERS**
                                            **UNITED STATES DISTRICT COURT JUDGE**