Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone: 415.772.4700
Facsimile:  415.772.4707
lking@kaplanfox.com
mchoi@kaplanfox.com

Nicholas I. Porritt (admitted *pro hac vice*)
Adam M. Apton (admitted *pro hac vice*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
nporritt@zlk.com
aapton@zlk.com

Jeffrey P. Campisi (admitted *pro hac vice*)
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-697-7714
jcampisi@kaplanfox.com

*Attorneys for Lead Plaintiffs Ali Shehk and*
*Alan Richards, and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE VIOLIN MEMORY INC. SECURITIES LITIGATION | Master Docket No. 13-CV-05486-YGR |
| | Hon. Yvonne Gonzalez Rogers |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ......................................................... 2

III.   THE SECURITIES ACT CLAIMS .................................................. 2

     A.    Securities Act Plaintiffs.................................................................. 3

     B.    Securities Act Defendants ............................................................. 3

     C.    Substantive Allegations for Securities Act Claims ..................... 6

         1.    The Registration Statement Failed to Disclose Material Defects and Development Problems Regarding the PCIe Cards ....................................................................................... 7

         2.    The Registration Statement Failed to Disclose Material Difficulties Optimizing the PCIe Cards for Toshiba ...................... 9

         3.    The Registration Statement Failed to Disclose that Violin Memory's PCIe Cards Failed to Gain Market Acceptance ............ 9

         4.    The Registration Statement Failed to Disclose Material Defects Concerning Violin Memory's 6000 Flash Arrays ........... 12

         5.    The Registration Statement Failed to Disclose Negative Trends in Federal Government Sales ........................................... 14

         6.    The Registration Statement Failed to Disclose that the U.S. Government Sequestration Was Negatively Impacting Violin Memory's Revenue ......................................................... 18

         7.    The Registration Statement Failed to Disclose Basile's Material Negative Business Experience in the Flash Memory Market .......................................................................... 20

         8.    The Registration Statement Failed to Disclose that Basile Artificially Inflated Sales of Violin Memory's 6000 Flash Arrays ..................................................................................... 21

         9.    The Registration Statement Failed to Disclose Purchase Order Commitments Pursuant to GAAP ...................................... 22

IV.   CLASS ALLEGATIONS ................................................................ 30

V.    PRAYER FOR RELIEF ................................................................. 31

VI.   JURY DEMAND ........................................................................... 32

Lead Plaintiffs Ali Shehk and Alan Richards (collectively "Plaintiffs"), by their undersigned Attorneys, allege in this Amended Consolidated Class Action Complaint (the "Amended Complaint") the following upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation by their attorneys and review of documents and materials including but not limited to: (a) relevant filings made by Violin Memory Inc. ("Violin Memory" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) public documents, conference calls, and press releases; and (c) research analysts' reports concerning the Company. Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth herein that will be obtained in discovery.  Certain of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.[1]

## I.  NATURE OF THE ACTION

1.  Investors in Violin Memory sustained significant losses due to the defendants' violations of the federal securities laws.  These violations, which occurred in connection with the Company's initial public offering on September 27, 2013 of 18 million shares of common stock at $9 per share (the "IPO"), stem from the defendants' failure to disclose material information regarding: (i) material technical defects with Violin Memory's Velocity Peripheral Component Interconnect Express Flash Memory Cards ("PCIe Cards") and lack of market acceptance of the Company's PCIe Cards; (ii) material engineering and development problems with regard to a second product line known as the 6000 Series Flash Memory Arrays ("6000 Flash Arrays"); (iii) material negative trends concerning sales to the federal government; (iv) material negative information concerning the background and business experience of the Company's Chief Executive Officer, Donald Basile; (v) unusual transactions that materially inflated the Company's income and revenue; and (vi) the

---

[1] The Court's Order dated October 31, 2014 dismissed certain of Plaintiffs' claims. Dkt. 87.  This Amended Complaint amends Plaintiffs' claims relating to violations under Section 12(a)(2) of the Securities Act of 1933 (Count II).  Other than amendments to Count II, and amendments regarding the employment status of certain individual defendants and the addition of pinpoint cites to the Registration Statement, no other substantive amendments have been made.  With regard to the remainder of the dismissed claims, Plaintiffs reassert them within this Amended Complaint so as to preserve them for an appeal if Plaintiffs appeal at a later date. *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).

Company's non-cancelable purchase orders as required by U.S. generally accepted accounting principles ("GAAP").

2.      On November 22, 2013, the Company began to reveal this material information to the public, causing Violin Memory's stock price to decline by $2.89 per share or approximately 40% on heavier than normal volume of approximately 11.8 million shares to close on November 22, 2013 at $3.11 per share.

3.      Plaintiffs file this Amended Complaint on behalf of themselves and all others who purchased or otherwise acquired Violin Memory securities in connection with the Company's IPO and/or on the public market between September 27, 2013 and November 21, 2013, inclusive (the "Class Period").  Plaintiffs assert strict liability and negligence claims under Sections 11, 12(a), and 15 of the Securities Act of 1933 ("Securities Act").

## II.      JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12(a), and 15 of the Securities Act (15 U.S.C. §§ 77k(a), 77l(a), and 77o(a)).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

6.      Venue is proper in this District pursuant to Section 22 of the Securities Act, and 28 U.S.C. § 1391(b) because the Company's headquarters are located in this District and certain of the acts alleged in this Amended Complaint occurred in this District.

7.      In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.      THE SECURITIES ACT CLAIMS

8.      Plaintiffs' Securities Act claims are premised on the material untrue statements and omissions contained in Violin Memory's Registration Statement filed with the SEC on Form S-1 on August 26, 2013, Amended Registration Statement filed with the SEC on Form S-1/A on September 16,

2013, and Prospectus filed with the SEC on Form 424B4 on September 27, 2013 (collectively, the "Registration Statement").

**A.    Securities Act Plaintiffs**

9.      The Court appointed Ali Shehk and Alan Richards, together The Shehk Investor Group, as Lead Plaintiffs by Order dated February 26, 2014.  Lead Plaintiffs Ali Shehk and Alan Richards purchased common stock in connection with the Company's IPO.  Lead Plaintiff Alan Richards purchased common stock in connection with the Company's IPO directly from J.P. Morgan Securities LLC ("J.P. Morgan"), an Underwriter Defendant (as defined below in ¶ 28).  Alan Richards' certification evidencing his purchases is annexed hereto as Exhibit "A" and is incorporated herein by reference.  Ali Shehk's amended certification evidencing his purchases is annexed hereto as Exhibit "B" and is incorporated herein by reference.

**B.    Securities Act Defendants**

10.     Defendant Violin Memory is a Delaware corporation with its principal executive offices located at 4555 Great America Parkway, Santa Clara, California 95054.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "VMEM."  Violin Memory purports to design and manufacture flash memory devices for servers and networks.  Flash memory is a computer storage medium that can be electrically erased and reprogrammed.  Flash Memory is used in memory cards, USB flash drives, solid-state drives, and similar products, for general storage and transfer of data.  Flash memory has potential advantages as compared to traditional hard disks or tape.  Flash memory does not have the mechanical limitations and latencies (or slowness) of hard drives, and has the potential to be more efficient relative to hard disks when considering speed, noise, power consumption, and reliability.

11.     At the time of the IPO, Violin Memory offered two main products: (i) all-flash memory arrays and (ii) PCIe server-based flash cards.  The Company introduced the 6000 Flash Arrays in September 2011, replacing the Company's legacy 3000 Flash Arrays.  The 6000 Flash Arrays purportedly utilize a proprietary "four-layer architecture that significantly improves performance density."  A typical 6000 Flash Array unit measures approximately 1.5 feet wide by

two feet deep and are housed on racks. The PCIe Cards, introduced in March 2013, were intended to provide generally the same technology and benefits of the 6000 Flash Arrays, but in a different form for other segments of the market. Unlike the 6000 Flash Arrays, PCIe Cards can operate in both servers and workstations via PCIe interfaces on a computer's motherboard.

12. Defendant Donald G. Basile ("Basile") served as the Company's President and Chief Executive Officer ("CEO") from April 2009 until the Company's Board of Directors terminated his employment on December 16, 2013. Basile also served as a member of the Company's Board of Directors from May 2009 until resigning on January 30, 2014. Prior to joining Violin Memory, Basile served as CEO at Fusion-io, Inc. ("Fusion-io"), from February 2008 to February 2009. Fusion-io is a provider of data-centric computing solutions and is a competitor of Violin Memory. On February 23, 2009, Basile's employment with Fusion-io was terminated "for cause" under the terms of his employment contract. Basile holds a Ph.D. and M.S. in Electrical Engineering from Stanford University. Basile signed or authorized the signing of the Company's Registration Statement filed with the SEC.

13. Defendant Dixon R. Doll, Jr. ("Doll"), served as the Company's Chief Operating Officer ("COO") and a member of its Board of Directors from July 2009 until his resignation from both positions on January 2, 2014. Prior to joining Violin Memory, Doll served as the Senior Vice President of Sales and Corporate Development at Fusion-io. On February 23, 2009, Doll separated from Fusion-io. Doll holds a M.B.A. from the University of Michigan Graduate School of Business and a B.A. in Government from Georgetown University. Doll signed or authorized the signing of the Company's Registration Statement filed with the SEC.

14. Defendant Cory J. Sindelar ("Sindelar") has served as the Company's Chief Financial Officer ("CFO") from December 2011 to the present. Sindelar signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15. Defendant Howard A. Bain III ("Bain") served as a member of the Company's Board of Directors from October 2012 to June 5, 2014. Bain served as Chairman of the Board of Directors beginning in August 2013. Bain also served as interim CEO between December 16, 2013 and February

1, 2014 following the termination of Basile's employment with the Company.   Bain signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.   Defendant Larry J. Lang ("Lang") has served as a member of the Company's Board of Directors from May 2010 to the present.   Lang signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.   Defendant Jeff J. Newman ("Newman") served as a member of the Company's Board of Directors from March 2009 to June 4, 2014.   Newman signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.   Defendant Mark N. Rosenblatt ("Rosenblatt") has served as a member of the Company's Board of Directors from September 2006 through the IPO.   Rosenblatt signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.   Defendant David B. Walrod ("Walrod") has served as a member of the Company's Board of Directors from September 2011 to the present.   Walrod signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.   Defendants Basile, Doll, Sindelar, Bain, Lang, Newman, Rosenblatt and Walrod are referred to collectively as the "Individual Securities Act Defendants."

21.   Defendant J.P. Morgan served as an underwriter for the Company in connection with the IPO. J.P. Morgan served as a joint book-running manager and as a representative of the underwriters for the IPO. J.P. Morgan sold 5,400,000 shares of Violin Memory common stock that were sold in in the IPO. J.P. Morgan assisted in the preparation and dissemination of the Registration Statement.

22.   Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter for the Company in connection with the IPO.   Deutsche Bank served as a joint book-running manager and as a representative of the underwriters for the IPO.   Deutsche Bank sold 4,554,000 shares of Violin Memory common stock in the IPO.   Deutsche Bank assisted in the preparation and dissemination of the Registration Statement.

23.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") served as an underwriter for the Company in connection with the IPO.   BofA Merrill Lynch

served as a joint book-running manager and as a representative of the underwriters for the IPO. BofA Merrill Lynch sold 4,554,000 shares of Violin memory common stock sold in the IPO. BofA Merrill Lynch assisted in the preparation and dissemination of the Registration Statement.

24.     Defendant Barclays Capital Inc. ("Barclays Capital") served as an underwriter for the Company in connection with the IPO. Barclays Capital served as a joint book-running manager for the IPO. Barclays Capital sold 1,800,000 shares of Violin Memory common stock sold in the IPO. Barclays Capital assisted in the preparation and dissemination of the Registration Statement.

25.     Defendant Robert W. Baird & Co. Incorporated ("Baird & Co.") served as an underwriter for the Company in connection with the IPO. Baird & Co. sold 810,000 shares of Violin Memory common stock sold in the IPO. Baird & Co. assisted in the preparation and/or dissemination of the Registration Statement.

26.     Defendant Pacific Crest Securities LLC ("Pacific Crest") served as an underwriter for the Company in connection with the IPO. Pacific Crest sold 810,000 shares of Violin Memory common stock sold in the IPO. Pacific Crest assisted in the preparation and/or dissemination of the Registration Statement.

27.     Defendant EM Securities LLC ("EM Securities") served as an underwriter for the Company in connection with the IPO. EM Securities sold 72,000 shares of Violin Memory common stock sold in the IPO. EM Securities assisted in the preparation and/or dissemination of the Registration Statement.

28.     Defendants J.P. Morgan, Deutsche Bank, BofA Merrill Lynch, Barclays Capital, Baird & Co., Pacific Crest, and EM Securities are hereinafter collectively referred to as the "Underwriter Defendants."

29.     Violin Memory, the Individual Securities Act Defendants and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

**C.     Substantive Allegations for Securities Act Claims**

30.     Violin Memory's Registration Statement was required to contain certain information pursuant to the Securities Act and Regulation S-K (17 C.F.R. Part 229), including but not limited to:

(i) descriptions of products and their respective statuses (e.g., whether in the planning stage, the degree to which product design has progressed or whether further engineering is necessary); (ii) existing trends or uncertainties reasonably expected to have a material unfavorable impact on revenues; (iii) descriptions of background business experience and professional competence for executive officers; and (iv) descriptions of any unusual or infrequent events or transactions materially affecting reported income and revenue.  Further, Violin Memory's Registration Statement was required to utilize GAAP with regard to its financial disclosures.  Notwithstanding, at the time Violin Memory's Registration Statement became effective, the Securities Act Defendants failed to disclose material information.

31.     Violin Memory's Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading.  The omissions and misrepresentations within the Registration Statement related to: (i) Violin Memory's PCIe Cards material technical defects and failure to gain market acceptance; (ii) material engineering and development problems relating to the 6000 Flash Arrays; (iii) the material negative trends with regard to the Company's federal government sales; (iv) Basile's "for cause" termination from Fusion-io; (v) unusual transactions that materially inflated the Company's reported revenue; and (vi) the Company's non-cancelable purchase orders.

**1.      The Registration Statement Failed to Disclose Material Defects and Development Problems Regarding the PCIe Cards**

32.     The Registration Statement represented that Violin Memory's PCIe cards "**are optimized** for applications that require **continuous access** to large quantities of low latency persistent memory located directly in servers.  **We have demonstrated** that our persistent memory-based storage solutions provide low latency and sustainable performance with enterprise-class reliability, availability and serviceability through product testing and customer feedback.  Our solutions enable customers to realize significant capital expenditure and operational cost savings by simplifying their data center environments."  (Registration Statement, p. 76 (emphasis added.))

33.     The Registration Statement also represented that the Company's "products are highly

technical and may contain undetected defects . . . that might, in turn, result in . . . harm to our reputation and business." The Company represented: **"Our [PCIe Cards] may contain undetected errors, defects or security vulnerabilities that could result in data unavailability, loss or corruption or other harm to our end-customers. . . . Any errors, defects or security vulnerabilities discovered in our products after commercial release, or any perception of the same in the marketplace, could result in a loss of revenue or delay in revenue recognition, injury to our reputation, a loss of end-customers or increased service and warranty costs, any of which could adversely affect our business."** (Registration Statement, p. 16 (emphasis added.))

34. These representations were untrue because at the time of the IPO the PCIe Cards were not optimized or sustainable due to material technical and engineering defects, including the following material defects:

- Inoperable firmware;
- Reliance on hardware instead of relying on supporting components, such as microprocessors;
- Delayed repair times due to the fact that Violin Memory's development team designed the PCIe Cards' hardware to be responsible for a lot of the PCIe Cards' functionality. Consequently, the PCIe development team had to repair hardware when attempting to fix a bug as opposed to reprogramming firmware, which is a far more difficult operation;
- Absence of training of sales representatives with regard to the PCIe Cards;
- Unexpected shutdowns; and
- The inability of the PCIe Cards to remain powered in the instance of a power disruption.

35. The Registration Statement's representations about the status of the Company's PCIe Cards was materially inaccurate because it failed to disclose the material design and technical problems that were materially impacting the completion of the PCIe Cards' development.

### 2.   The Registration Statement Failed to Disclose Material Difficulties Optimizing the PCIe Cards for Toshiba

36.   The Registration Statement represented the following concerning the Company's development of the PCIe Cards for Toshiba:

> In March 2013, we expanded our innovation in persistent memory technologies and proprietary techniques in flash management from our memory arrays to our Velocity PCIe Flash Memory Cards. Our Velocity PCIe Flash Memory Cards leverage our expertise in persistent memory-based storage and controller design, as well as our vMOS software stack, to offer a differentiated architecture in a widely deployable PCIe form factor. Additionally, we believe our relationship with Toshiba, a leading provider of flash memory and one of our principal stockholders, allows us to design our systems to unlock the inherent performance capabilities of flash technology and enables us to develop around new generations of flash memory rapidly. . . .
>
> In July 2013, we entered into a PCIe Card Development Agreement with Toshiba, pursuant to which we will develop a derivative product to our Velocity PCIe Flash Memory Card which complies with Toshiba's specifications and sell sample PCIe cards to Toshiba. Pursuant to this agreement, Toshiba paid us $16 million. The $16 million payment consisted of $8 million for our services to be performed for the development of the PCIe cards, and $8 million for our sale of sample PCIe cards to Toshiba and related support services.

(Registration Statement, p. 76.)

37.   These representations were materially false and misleading because they omitted the true status of the Company's PCIe Cards programming and development for Toshiba. At the time of the IPO, Violin Memory was experiencing material difficulties building and developing the PCIe Cards in accordance with Toshiba's specifications. Further, due to these material technical problems, the Company was experiencing material difficulties expanding its PCIe Cards business to new customers, negative trends, and uncertainties that Violin Memory should have reasonably expected to materially and unfavorably impact the Company's revenues and income.

### 3.   The Registration Statement Failed to Disclose that Violin Memory's PCIe Cards Failed to Gain Market Acceptance

38.   The Registration Statement failed to disclose that in the months leading up to the IPO, the Company had already observed that the PCIe Cards had failed to gain market acceptance. In so doing, the Registration Statement failed to disclose material information regarding its PCIe Cards product line and the Company's operations.

39.     The Registration Statement represented that the Company's "operating results may fluctuate significantly" depending on "a variety of factors, many of which are outside of [its] control." The Company identified a number of these factors.  In particular, the Company stated: **"Factors that are difficult to predict and that could cause our operating results to fluctuate include: . . . the degree to which our [PCIe Cards] gain market acceptance . . . ."** (Registration Statement, p. 14 (emphasis added.))

40.     Further, the Registration Statement represented that if the Company's "[PCIe Cards] do not gain market adoption or sales of [the] [PCIe Cards] grow more slowly than anticipated," then the Company would "not be able to increase [its] revenue sufficiently to achieve and maintain profitability." The Registration Statement further represented that it had "devoted a significant amount of resources to developing and marketing [Violin Memory's] [PCIe Cards]"; that the Company's "future growth will substantially depend on the market acceptance and adoption of this new product"; and that "if [the PCIe Cards] do not gain market acceptance, [the Company's] results of operations, business and prospects would be materially and adversely affected."  (Registration Statement, p. 18 (emphasis added.))

41.     Contrary to the representations in the Registration Statement, at the time of the IPO, the PCIe Cards had already failed to gain market acceptance due to the following:

- The PCIe Cards' material defects caused material difficulty in sales and marketing of the PCI Cards.  For example, Violin Memory's potential customers were not even agreeing to free trials, let alone paying for the PCIe Cards;

- The Company's sales personnel were opting against selling the PCIe Cards to the market throughout 2013 due to their material technical problems, including but not limited to improper shutdowns and failing firmware.  As of the date of the IPO, the Company did not have any material customers or sales pipeline for the PCIe Cards in addition to its agreement with Toshiba.

42.     Violin Memory's disclosures concerning its financial results for its 2014 third fiscal quarter (ended October 31, 2013), and its 2014 fiscal year-end and 2014 fiscal fourth quarter (ended

January 31, 2014), further evidence the falsity of the above statements.  On November 22, 2013, Defendant Sindelar, during the Company's conference call concerning its financial results for the fiscal quarter ended October 31, 2013, admitted that the Company "need[ed] to make more progress with the development of [its] [PCIe Cards] product line"; that the PCIe Cards was "an area [the Company] need[ed] to continue to work on"; that the Company was "not seeing as much revenue from [the PCIe Cards] product line to date"; and that the Company was consequently forecasting less than $1 million in revenue from PCIe Cards for the quarter ending January 31, 2014 (compared to $1.9 million in revenue earned for the quarter ended October 31, 2013).  Also on November 22, 2013, Defendant Basile admitted "we **continue to tune and optimize our firmware and software drivers** for a variety of operating systems (inaudible) including Linux, Windows, VMware and Microsoft Hyper-V.  **These additional optimizations have delayed our revenue**" (emphasis added).

43.    On February 20, 2014, the Company issued a press release regarding the PCIe Cards product line.  The press release stated that the Company's Board of Directors "authorized a review of strategic alternatives for [the PCIe Cards] business" and that the Company "anticipate[d] it [would] complete the review and take any related actions by the end of its first fiscal quarter . . . ."

44.    On March 6, 2014, during a conference call concerning the Company's financial results for the quarter and year ended January 31, 2014, Kevin DeNuccio, the Company's new and current CEO, disclosed that the Company was "actively seeking a buyer for [the PCIe Cards] business."  Sindelar further advised that the Company would be taking a $9.2 million write-off in connection with its remaining PCIe Cards inventory.

45.    Based on the Registration Statements' discussion of the Company's "Critical Accounting Policies and Estimates" and "Notes to Consolidated Financial Statements," the write-off was necessary because the PCIe Cards were "determine[d] to be obsolete or in excess of forecasted usage." (Registration Statement, p. F-12.)  By the time the Registration Statement became effective, there was no longer any question about *whether* or *if* the PCIe Cards would gain market acceptance.  The PCIe Cards had already been offered to and rejected by the market.  Consequently,

the above statements concerning the possibility of the PCIe Cards gaining market acceptance misrepresented material facts and/or failed to state material facts necessary to make the statements not misleading.

**4.     The Registration Statement Failed to Disclose Material Defects Concerning Violin Memory's 6000 Flash Arrays**

46.     The Registration Statement represented that "[o]ur Flash Memory Arrays integrate enterprise-class hardware and software technologies to cost effectively address the limitations of other storage solutions.  Our storage systems are based on a four-layer hardware architecture which is tightly integrated with our Violin Memory Operating System, or vMOS, software stack to optimize the management of flash memory at each level of our system architecture."  (Registration Statement, p. 1.)

47.     This representation was untrue because in the months leading up to the IPO, Violin Memory's development and production of the 6000 Flash Arrays experienced material negative developments and engineering defects, such as: (a) material problems with the 6000 Flash Arrays' "controller cards" that caused the 6000 Flash Array to lose power and interfered with the built-in redundancy feature; (b) material defects that caused the 6000 Flash Arrays to fail to protect data, as evidence by "Failover Testing"; (c) material difficulties developing data management software for the 6000 Flash Array; and (d) the need for costly unique IP addresses to utilize the arrays, defects that caused compatibility problems for the Company's customers that prevented customers from utilizing the 6000 Flash Arrays.

48.     The Registration Statement represented that the 6000 Flash Arrays "must interoperate with network interfaces, such as operating systems, software applications and hardware developed by others . . . ."  The Registration Statement further represented that the Company's 6000 Flash Arrays **"comprise only a part of a datacenter's infrastructure"**; that the 6000 Flash Arrays **"must interoperate with our end-customers' existing infrastructure, specifically their networks, servers, software and operating systems"**; that **"[w]hen new or updated versions of these software operating systems or applications are introduced, [the Company] must sometimes**

**develop updated versions of our software so that [its] products interoperate properly"**; and that the Company **"may not accomplish these development efforts quickly, cost-effectively or at all"** which would cause the Company to **"fail to increase, or . . . lose, market share and experience reduced demand for our products, which would adversely affect [its] business, operating results and financial condition."** (Registration Statement, p. 19 (emphasis added.))

49.     The Registration Statement also represented that the Company's "products are highly technical and may contain undetected defects . . . that might, in turn, result in . . . harm to our reputation and business." The Company represented: **"Our [6000 Flash Arrays] may contain undetected errors, defects or security vulnerabilities that could result in data unavailability, loss or corruption or other harm to our end-customers. . . . Any errors, defects or security vulnerabilities discovered in our products after commercial release, or any perception of the same in the marketplace, could result in a loss of revenue or delay in revenue recognition, injury to our reputation, a loss of end-customers or increased service and warranty costs, any of which could adversely affect our business."** (Registration Statement, p. 16 (emphasis added.))

50.     Contrary to the representations in the Registration Statement, at the time of the IPO, the 6000 Flash Arrays had already experienced negative material software and firmware development problems. Indeed, as alleged above, Defendant Basile later admitted, "we **continue to tune and optimize our firmware and software drivers** for a variety of operating systems (inaudible) including Linux, Windows, Vmware and Microsoft Hyper-V. **These additional optimizations have delayed our revenue.**" (Emphasis added.)

51.     At the time of the IPO, the 6000 Flash Arrays had experienced the following material defects:

- Engineering defects, such as problems with the products' "controller cards" that caused them to lose power and interfere with the built-in redundancy feature that resulted in lost sales;

- Inability to develop data management software for the 6000 Flash Arrays capable of standard memory devices functions (e.g., duplicating and replicating);

- • Software incompatibility problems;

- • Material delays in developing a software system enabling Company customers to manage and oversee the 6000 Flash Arrays without experiencing low throughput;

- • Material engineering defects with regard to the 6000 Flash Arrays, including each 6000 Flash Array (box) required six unique internet protocol ("IP") addresses which resulted in additional costs for the customer because IP addresses are expensive;

- • The 6000 Flash Arrays were unstable and caused a material number of the 6000 Flash Arrays to fail power tests and repairs; and

- • Improper shutdowns and an inability to upgrade the product's firmware and/or software without disrupting ongoing processes.

52.     The flawed operability of the 6000 Flash Arrays was a fact by the time the Registration Statement became effective.  Accordingly, the above statements from the Registration Statement, which presented the risk of inoperability as only a possibility, failed to disclose material facts and/or failed to state material facts necessary to make the statement not misleading.

### 5.     The Registration Statement Failed to Disclose Negative Trends in Federal Government Sales

53.     The Registration Statement stated that the Company "expect[ed] large and concentrated purchases by a limited number of customers to continue to represent a substantial amount of [its] revenue" and that "any loss of, or delay or reduction in purchases by, a small number of customers could adversely affect [the Company's] operating results."   The Registration Statement explained further: **"As a consequence of our limited number of customers and the concentrated nature of their purchases, our quarterly revenue and operating results may fluctuate from quarter to quarter and are difficult to estimate.  For example, any acceleration or delay in anticipated product purchases or the acceptance of shipped products by our larger customers could materially impact our revenue and operating results in any quarterly period. . . .  The loss of, or a significant delay or reduction in purchases by, a small number of**

**customers could materially harm our business and operating results."** (Registration Statement, p. 10 (emphasis added.))

54.     The Registration Statement also stated that as the Company seeks to increase its sales to government customers it could potentially "face difficulties and risks unique to government contracts that may have a detrimental impact on our business, operating results and financial condition."  The Registration Statement noted that **"[t]he United States government can also suspend operations if Congress does not allocate sufficient funds to a particular agency or organization, and the United States government may allow our competitors to protest our successful bids.  The occurrence of any of these events may negatively affect our business, operating results and financial condition."** (Registration Statement, p. 25 (emphasis added.))

55.     The Registration Statement purportedly warned further that "[a]dverse economic conditions and reduced information technology spending could have an adverse impact on our revenue, revenue growth rates, and operating results."  As an example, the Registration Statement noted that **"[a] general economic downturn, such as the slowdown that began in 2008, could dramatically reduce business spending on technology infrastructure"**; that **"[t]he global economic environment has been volatile as a result of many factors, including the economic uncertainty faced by several European countries"**; and that **"[i]f this volatility continues and there is a growing weakness in general economic conditions, a reduction in storage infrastructure spending, or deterioration in the financial condition of our customers and customer prospects will adversely impact our business, revenue, operating results and financial condition, including as a result of potential inventory writedowns, longer sales cycles, potential increases in price competition, reduced unit sales, increased number of days of sales outstanding and customer payment defaults."** (Registration Statement, p. 27 (emphasis added.))

56.     In addition to the above "RISK FACTORS," **the Registration Statement, including the section titled "Key Trends Affecting Our Results of Operations," omitted in its entirety the material shortfall in revenue attributable to federal government sales and adverse economic conditions**. The material adverse impact of federal government budget constraints on Violin Memory's

operations was a significant economic change and/or existing trend or uncertainty that materially affected Violin Memory's operations and revenue in an adverse manner.  Consequently, the Registration Statement's disclosures within the section titled "Key Trends Affecting Our Results of Operations" misrepresented material facts and/or failed to state material facts necessary to make the statement not misleading.

57.     The above representations were untrue because the Registration Statement failed to disclose that, at the time of the IPO, sales in the Company's Federal division had been materially declining over the course of the fiscal year.

58.     As to the Company's purported then-present sales growth trends, with the third quarter 2013 then two-thirds complete as of September 2013, the Registration Statement represented that the Company had "grown [its] business substantially for the past three years with total revenue of $11.4 million, $53.9 million and $73.8 million in fiscal 2011, 2012 and 2013, respectively and $51.3 million for the six months ended July 31, 2013." (Registration Statement, p. 1.)

59.     To the contrary, the Company's federal government sales had materially declined in the months leading up to the IPO.

60.     This negative trend was material because Violin Memory reported approximately $14.7 million in revenue from federal government sales for fiscal 2013 (period ended January 31, 2013), which represented 20% of the Company's reported revenue for that fiscal year.

61.     On August 1, 2013, at the beginning of Violin Memory's fiscal quarter before the Company's IPO, the Company expected $10 million in federal government sales.  However, by the time of the IPO, the Company anticipated sales had materially declined.

62.     On November 22, 2013, Defendant Basile reported $2.6 million in "bookings" for 3Q14.  On March 6, 2014, Sindelar clarified that the Company received only approximately $1.5 million in revenue from federal government sales.  In fiscal 2014, the Company's revenue from federal government sales was approximately $4 million.

1

2

63.    The following chart displays the Company's federal government sales against the Company's overall revenue for fiscal years 2013 and 2014:[2]

3

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

64.    Based on the foregoing, Violin Memory was experiencing a material decline with regard to federal government sales at the time of the IPO. This decline had already impacted as of the effective date of the Registration Statement and was going to continue impacting Violin Memory's revenue in a negative manner thereafter. The Registration statement should have

20

21

22

23

24

25

26

27

28

[2] The following chart incorporates Violin Memory's financial results as presented in the Company's Registration Statement and earnings conference calls held on November 21, 2013 and March 6, 2014, as well as an analyst report from Sterne Agee. Violin Memory's "Federal Revenue" for the first two quarters of fiscal years 2013 and 2014 are estimates based on year-end federal sales totals less the known federal revenues for the last two quarters of fiscal years 2013 and 2014. For example, Sindelar stated during the March 6, 2014 earnings conference call that federal government revenue for fiscal 2014 totaled $4 million. He also stated that federal government revenue for the third quarter was $1.5 million and the fourth quarter was "negligible". Accordingly, Violin Memory received the difference between $4 million and $1.5 million, or $2.5 million, during the first two quarters of fiscal 2014, or $1.25 million for each quarter. Similarly, Basile disclosed during the November 21, 2013 earnings conference call that federal government sales accounted for approximately 20% of fiscal 2013 revenue, or $14.7 million. Given that Violin Memory's federal government revenue for the last two quarters was $3 million and $2 million, respectively, revenue for the first two quarters of fiscal 2013 comprised the difference, or $4.85 million for each quarter.

disclosed this decline in accordance with Item 303 of Regulation S-K (17 C.F.R. Part 229), but failed to do so.

**6.      The Registration Statement Failed to Disclose that the U.S. Government Sequestration Was Negatively Impacting Violin Memory's Revenue**

65.      The Registration Statement failed to disclose the impact of the ongoing sequester related budget reductions on the Company's revenue during the fiscal quarters leading up to the IPO.  As illustrated above, the Company's federal government sales were materially decreasing.  The decline in revenue from federal government sales began during the first and second quarters of Violin Memory's fiscal 2014, which was at or around the time President Barack Obama issued the "Sequestration Order for Fiscal Year 2013" (available at http://www.whitehouse.gov/sites/default/files/2013sequestration-order-rel.pdf).

66.      The Registration Statement represented that as the Company seeks to increase its sales to government customers it could potentially "face difficulties and risks unique to government contracts that may have a detrimental impact on our business, operating results and financial condition."  The Registration Statement noted that **"[t]he United States government can also suspend operations if Congress does not allocate sufficient funds to a particular agency or organization, and the United States government may allow our competitors to protest our successful bids.  The occurrence of any of these events may negatively affect our business, operating results and financial condition."** (Registration Statement, p. 25 (emphasis added.))

67.      The Registration Statement represented further that "[a]dverse economic conditions and reduced information technology spending could have an adverse impact on our revenue, revenue growth rates, and operating results."  As an example, the Registration Statement noted that **"[a] general economic downturn, such as the slowdown that began in 2008, could dramatically reduce business spending on technology infrastructure"**; that **"[t]he global economic environment has been volatile as a result of many factors, including the economic uncertainty faced by several European countries"**; and that **"[i]f this volatility continues and there is a growing weakness in general economic conditions, a reduction in storage infrastructure spending, or**

1   **deterioration in the financial condition of our customers and customer prospects will**

2   **adversely impact our business, revenue, operating results and financial condition, including**

3   **as a result of potential inventory writedowns, longer sales cycles, potential increases in price**

4   **competition, reduced unit sales, increased number of days of sales outstanding and customer**

5   **payment defaults.**" (Registration Statement, p. 27 (emphasis added.))

6          68.     Violin Memory's report filed with the SEC on Form 10-Q for the quarter ended

7   October 31, 2013 demonstrates that the material decline in federal government sales was due to the

8   ongoing sequestration, a trend that negatively affected Violin Memory's financial condition in the

9   months leading up to the IPO.  In the section titled, "Management's Discussion and Analysis of

10  Financial Condition and Results of Operations," the Form 10-Q discusses the Company's revenue

11  for the nine- and three-month period ended October 31, 2013.  The Form 10-Q reads in pertinent

12  part:

13         **Three Months Ended October 31, 2013 Compared to Three Months Ended**
           **October 31, 2012**
14
           Revenue increased $7.7 million to $28.3 million for the three months ended
15         October 31, 2013 as compared to $20.6 million for the three months ended
           October 31, 2012. . . .  The increase in revenues was partially offset by a decrease
16         in the shipments to the US Federal government as a result of shut down of the federal
           government and **its continued sequester related budget reduction**.  We expect
17         this slowdown in our sales to the U.S. Federal government to persist in the near term.

18         . . .

19         **Nine Months Ended October 31, 2013 Compared to Nine Months Ended**
           **October 31, 2012**
20
           Revenue increased $28.7 million to $79.6 million for the nine months ended
21         October 31, 2013 as compared to $50.9 million for the nine months ended
           October 31, 2012. . . .  The increase in revenues was partially offset by a decrease
22         in the shipments to the US Federal government as a result of shut down of the federal
           government and **its continued sequester related budget reduction**.  We expect
23         this slowdown in our sales to the U.S. Federal government to persist in the near term.

24  (Violin Memory, Form 10-Q, filed December 9, 2013, pp. 21-22 (emphasis added.))

25         69.     Based on the Violin Memory's report for the quarter ended October 31, 2013, which

26  was not filed with the SEC until after the IPO, the "continued sequester related budget reduction"

27  had been negatively impacting the Company's revenue at the time of the IPO.

28

70.     The Registration Statement should have disclosed the ongoing impact of the sequestration on the Company's revenue.  EMC Corporation, one of Violin Memory's largest direct competitors, acknowledged the sequestration in a quarterly disclosure statement filed with the SEC on August 2, 2013.  EMC Corporation alerted investors of the "impact of continuing uncertainty associated with the budget 'sequestration' in the United States government."  Violin Memory, on the other hand, referred generally to the "slowdown that began in 2008" and "economic uncertainty" being "faced by several European countries."

71.     The sequestration constituted a significant economic change that was materially affecting Violin Memory's income from operations before, during, and after the IPO. Consequently, the Registration Statement should have reported the impact of the ongoing sequestration in accordance with Item 303 of Regulation S-K (17 C.F.R. Part 229), but failed to do so.

### 7.     The Registration Statement Failed to Disclose Basile's Material Negative Business Experience in the Flash Memory Market

72.     The Registration Statement contained the following representation concerning Defendant Basile:

> Donald G. Basile has served as our Chief Executive Officer since April 2009 and as a member of our board of directors since May 2009.  Prior to joining us, Mr. Basile served as Chief Executive Officer at Fusion-io, Inc., a provider of data-centric computing solutions, from February 2008 to February 2009 and its Chairman of the Board from August 2006 to February 2009.  Prior to that, Mr. Basile served as Vice President of UnitedHealth Group Incorporated, a health care company, from January 2006 to February 2008.  Mr. Basile received Ph.D. and M.S. degrees in Electrical Engineering from Stanford University.

(Registration Statement, p. 97.)

73.     This representation was materially untrue because the Registration Statement failed to disclose that on February 23, 2009, Fusion-io, a company that develops and produces flash memory products, terminated the employment of Defendant Basile "for cause."

74.     Basile's December 31, 2008 employment agreement with Fusion-io provided that he could be terminated for cause for the following reasons: (a) "personal dishonesty by Executive

involving Company business, or breach of Executive's fiduciary duty to Company; (b) indictment or conviction of a felony or other crime involving moral turpitude or dishonesty; (c) Executive willful refusal to comply with the lawful requests made of Executive by the Board reasonably related to his employment by the Company and the performance of his duties with respect thereto . . . .; (d) material violation of the Company's policies after written notice to Executive and an opportunity to be heard by the Board and his failure to cure such violation within a reasonable period of time . . . .; and (e) a material breach by Executive of an opportunity to be heard by the Board and his failure to fully cure such breach . . . ." Defendant Basile was terminated for several reasons constituting termination "for cause" under the terms of his employment agreement, according to a pleading in a federal lawsuit between Fusion-io and Defendant Basile, the existence of which was also never disclosed in the Registration Statement. With regard to the federal lawsuit, Fusion-io sued Defendants Basile, Doll, and Violin Memory alleging, among other things, misappropriation of trade secrets, conversion, breach of fiduciary duty/duty of loyalty, violations of the Federal Computer Fraud and Abuse Act.

75.     The above information concerning Defendant Basile's background and business experience was material. In deciding whether or not to invest in the Company, Plaintiffs and other members of the Class would have considered the fact that Defendant Basile was recently terminated "for cause" from his position as Chief Executive Officer with one of the Company's main competitors. Moreover, the above information was relevant with regard to the Defendant Basile's responsibilities in prior positions, overall professional competence, experience, qualifications, attributes, and skills to serve as directors and officers of a start-up publicly traded company. The Registration Statement should have disclosed the above material information regarding Defendant Basile's background and business experience pursuant to Item 401 of Regulation S-K, but failed to do so.

**8.     The Registration Statement Failed to Disclose that Basile Artificially Inflated Sales of Violin Memory's 6000 Flash Arrays**

76.     The Registration Statement reported product revenue for the first and second

quarters of fiscal 2014 equal to $22,478,000 and $23,595,000, respectively.  The Registration Statement further represented that, relative to the first six-months ended July 31, 2012, product revenue increased "primarily due to an increase of approximately 80% in the number of Flash Memory Arrays sold . . . ."  Additionally, the Registration Statement represented that sales of the Company's 6000 Flash Arrays represented "approximately 84% [$24,406,200] and 91% [$41,926,430] of [the Company's] product revenue for the six months ended July 31, 2012 and 2013."  (Registration Statement, p. 51.)  These statements were untrue and omitted material facts necessary to make the statements not misleading.

77.     Pursuant to Item 303 of Regulation S-K (17 C.F.R. Part 229), the Registration Statement was required to disclose unusual or infrequent transactions that materially affected reported income.  The Registration Statement failed to disclose or explain how Violin Memory in part material achieved the increase in product revenue.

78.     Before the IPO, Violin Memory sold the 6000 Flash Arrays to J.P. Morgan and BoA Merrill Lynch in exchange for being selected as underwriters for the Company's IPO.  The sales to J.P. Morgan and BoA Merrill Lynch resulted in product revenue gains for the Company of $1.4 million and $1.6 million for the first two quarters of fiscal 2014, respectively, and underwriting fees in favor of J.P. Morgan and BoA Merrill Lynch totaling approximately $3.4 million and $2.8 million, respectively.  Total product revenue for these quarters equaled $22,478,000 and $23,595,000, respectively.  Accordingly, the sales to J.P. Morgan and BoA Merrill Lynch amounted to approximately 6.2% ($1,393,636) and 6.8% ($1,604,460) of the total product revenue for the respective quarters and, therefore, materially inflated Violin Memory's revenue.  Given the unusual means by which the transactions were negotiated, the Registration Statement should have disclosed the above information but failed to do so.

9.      **The Registration Statement Failed to Disclose Purchase Order Commitments Pursuant to GAAP**

79.     The Registration Statement included Violin Memory's unaudited financial statements as of July 31, 2013, and included a representation that all subsequent events through

September 13, 2013 were considered in preparing those financial statements. The financial statements provided in the Registration Statement included the Company's statement of operations data for the fiscal years ended January 31, 2011, 2012, and 2013, and balance sheet data as of January 31, 2012 and 2013. The Registration Statement also included the Company's statement of operations data for the six months ended July 31, 2012 and 2013 and balance sheet data as of July 31, 2013. The Company's audited and unaudited financial statements were purportedly prepared in accordance with GAAP.

80.    The Registration Statement represented that the "Company depends entirely upon contract manufacturer to manufacture its products and provide test services. Due to the lengthy lead times, the Company must order from its contract manufacturer well in advance and is obligated to pay for the materials when received and services once they are completed."

81.    As of July 31, 2013, the Company, in violation of GAAP, specifically FASB Codification 440-10-50-2 and 440-10-50-4, failed to disclose the amount of non-cancelable purchase orders for commitments that had a remaining term in excess of one year as of the date of the latest balance sheet presented.

82.    The Registration Statement reported that, as of January 31, 2013, the Company had approximately $15.9 million of outstanding purchase commitments to such contract manufacturer and other vendors. However, Violin Memory's financials in the Registration Statement did not disclose the amount of outstanding purchase commitments as of July 31, 2013.

83.    The failure by Violin Memory to disclose the amount of non-cancelable purchase commitments caused the Registration Statement and, in particular the July 31, 2013 financial statements, to be misleading and in violation of GAAP.

84.    In an environment where product sales are materially declining or nonexistent, as in the case of the PCIe Cards, trends concerning outstanding purchase commitments are material to investors because such negative trends indicate that certain inventory may not be sold, requiring the Company to increase provisions for obsolete inventory.

85.    To this end, in the Company's report for the quarter ended October 31, 2013 filed

with the SEC on form 10-Q, Violin Memory disclosed that purchase commitments were in excess of $85 million, including non-cancelable purchase orders, an increase from January 31, 2013 of approximately 435%, a material negative trend that was not disclosed to investors in the Registration Statement.

86.     This trend that continued from January 31, 2013 through October 31, 2013 makes it highly unlikely that the Company did not have any unconditional purchase obligations as of July 31, 2013, the amount of which would have been considered by reasonable investors in making their decisions to purchase Violin Memory stock.

87.     On March 6, 2014, the Company reported its financial results for the quarter and year ended January 31, 2014, and disclosed that the Company recorded a PCIe Cards inventory provision of $9.2 million.

## COUNT I

### The Securities Act Defendants Violated Section 11 of the Securities Act

88.     Plaintiffs repeat and reallege the allegations contained above.

89.     As set forth above, Violin Memory's Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

90.     Violin Memory is the registrant for the IPO.  As issuer of the shares, Violin Memory is strictly liable to Plaintiffs and to the members of the Class for the materially untrue statements and omissions alleged herein.

91.     Violin Memory's Registration Statement was signed by Basile on behalf of the Company.

92.     The Individual Securities Act Defendants each appointed both Basile and Sindelar as their true and lawful attorneys-in-fact and agents for the purpose of signing "any and all amendments including post-effective amendments" and "perform[ing] each and every act and thing requisite and necessary to be done . . . ."  The Individual Securities Act Defendants signed or authorized others to sign the Registration Statement on their behalf.

93.     The Individual Securities Act Defendants were directors of or partners in Violin Memory at the time of the filing of the Registration Statement.

94.     The Individual Securities Act Defendants were named in the Registration statement as being or about to become a director of, or person performing similar functions in, the Violin Memory.

95.     The Underwriter Defendants were underwriters with respect to the Violin Memory securities offered in the IPO.

96.     Plaintiffs and the other members of the Class purchased Violin Memory securities in the IPO.

97.     Plaintiffs and the other members of the Class were damaged by Violin Memory, the Individual Securities Act Defendants, and the Underwriter Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

98.     This claim was brought within the applicable statute of limitations.

99.     By reason of the foregoing, Violin Memory, the Individual Securities Act Defendants, and the Underwriter Defendants have violated Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Class.

## COUNT II

### The Underwriter Defendants Violated Section 12(a)(2) of the Securities Act

100.    Plaintiffs repeat and reallege the allegations contained above.

101.    The Underwriter Defendants offered or sold Violin Memory securities by the use of means or instruments of transportation or communication in interstate commerce or the mails.

102.    The Underwriter Defendants offered or sold Violin Memory securities by means of a prospectus or oral communication.

103.    The underwriting fee for Violin Memory's IPO was "equal to the public offering price per share of common stock less the amount paid by the underwriters to [the Company] per share of common stock."  (Registration Statement, p. 133.)  The Underwriter Defendants received a fee of at least $11.3 million.  (Registration Statement, p. 133.)

104.    The prospectus or oral communication by which the Underwriter Defendants offered or

sold Violin Memory securities contained an untrue statement of a material fact and omitted to state a material fact necessary in order to make the statements not misleading.

105.   The Underwriter Defendants knew, or could have known through the exercise of reasonable care, of the untrue statements and omissions in the Registration Statement.

106.   Persons liable under Section 12 include persons who pass title, or any person that engages in solicitation.

### a.   The Underwriter Defendants Passed Title to Violin Memory Stock to Class Members.

107.   As set forth in the Registration Statement, Violin Memory offered to investors "the shares of common stock described in this prospectus through a number of underwriters.  J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated [acted] as joint book-running managers of the offering and as representatives of the underwriters.  Barclays Capital Inc. [] also [acted] as a joint book-running manager of [the] offering. [The Company] [has] entered into an underwriting agreement with the underwriters.  Subject to the terms and conditions of the underwriting agreement, [the Company] [has] agreed to sell to the underwriters, and each underwriter has severally agreed to purchase, at the public offering price less the underwriting discounts and commissions set forth on the cover page of this prospectus, the number of shares of common stock" as set forth above in Paragraphs 21-27.  (Registration Statement, p. 132.)

108.   In the IPO, Violin Memory passed title to the IPO shares to the Underwriter Defendants. The Underwriter Defendants then sold shares of Violin Memory common stock in the IPO and passed title to members of the Class.

109.   In the IPO, J.P. Morgan passed title to 4,000 shares of Violin Memory common stock to Lead Plaintiff Alan Richards.  Similarly, the other Underwriter Defendants passed title to members of the Class.

1

2

**b.      J.P. Morgan Solicited Members of the Class to Purchase Violin Memory Stock.**

3      110.   On September 21, 2014, J.P. Morgan sent a communication to Lead Plaintiff Alan

4  Richards that stated "[a]s you may know, Violin Memory, Inc. announced an initial public offering

5  of common shares.  The offering will be made through a group of underwriters with J.P. Morgan

6  Securities LLC acting as a book-running manager."  A copy of J.P. Morgan's communication dated

7  September 21, 2014 (hereinafter the "Sept. 21 Solicitation") is annexed to this Amended Complaint

8  (and incorporated herein) as Exhibit "C".

9      111.   Under Section 2(a)(3) of the Securities Act, the term "offer" "shall include every

10  attempt or offer to dispose of, or solicitation of an offer to buy, a security or security interest, for

11  value."

12      112.   A "book-running manager" is the main underwriter or lead manager in the issuance

13  of new equity.  In investment banking, the book runner is the underwriting firm that runs, or who

14  is in charge, of the books.

15      113.   The Sept. 21 Solicitation further stated that "[J.P. Morgan has] set aside a limited

16  number of shares for officers, directors, employees, friends and family of Violin Memory, Inc. to

17  purchase through a program we call the Direct Share Program and arrangements have been made

18  with J.P. Morgan Securities LLC to handle the sale of these common shares for the benefit of the

19  participants in the Directed Share Program.  The purchase price if you buy common shares through

20  the Directed Share Program is the same as the offering price to the public . . . . If you have an

21  interest in purchasing common shares in the public offering, please proceed by selecting the 'I am

22  interested in continuing with the Directed Share Program and consent to receiving electronic

23  information documents' button at the bottom on the page . . . ."  (Sept. 21 Solicitation, Exhibit A,

24  p. 1.)

25      114.   Upon indicating his interest in purchasing Violin Memory shares, Lead Plaintiff

26  Alan Richards acknowledged, among other things, that "an arrangement [had] been made with J.P.

27  Morgan Securities LLC for the sale of the reserved shares and that when the Registration Statement

28

covering the proposed offering is declared effective[] I will be notified electronically or by a J.P. Morgan Securities LLC Account representative to confirm my allocation of shares." (Sept. 21 Solicitation, Exhibit A, p. 5.) Lead Plaintiff Alan Richards also acknowledged that he "[understood] that the account being opened with J.P. Morgan Securities LLC is solely meant to facilitate [the] Directed Share Plan and will coordinate with a J.P. Morgan Securities LLC account representative to discuss further investment opportunities and requirements." (Sept. 21 Solicitation, Exhibit A, p. 5.)

115.    Once Lead Plaintiff Alan Richards agreed to J.P. Morgan's terms and conditions, he was notified that "[a]fter the registration statement [became] effective, and assuming [he] [met] certain regulatory requirements and [had] been approved by J.P. Morgan Securities LLC, [he] [would] be informed by e-mail and/or phone of the exact offering price per common share at that time, as well as the number of common shares allocated to you [him] . . . ." (Sept. 21 Solicitation, Exhibit A, p. 6.) J.P. Morgan further notified him that "[i]f [he] confirm[ed] [his] intention to purchase common shares, a copy of the prospectus in final form [would] be emailed to [him] by J.P. Morgan Securities LLC." (Sept. 21 Solicitation, Exhibit A, p. 6.)

116.    In the IPO, Lead Plaintiff Alan Richards and other members of the Class purchased Violin Memory securities directly from the Underwriter Defendants and received trade confirmations stating that the securities were "SOLD PURSUANT TO REGISTRATION STATEMENT OR WHERE PROSPECTUS OTHERWISE REQUIRED." (A copy of Lead Plaintiff Alan Richards' trade confirmation is annexed to this Amended Complaint (and incorporated herein) as Exhibit "D". The Underwriter Defendants actively and directly engaged certain members of the Class for the purpose of effecting the selling and purchasing of Violin Memory stock in the IPO.

117.    As set forth above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements not misleading, including defendants' failure to disclose material information regarding: (i) material negative trends concerning sales to the federal government; (ii) material negative information concerning the

background and business experience of the Company's Chief Executive Officer, Donald Basile; and (iii) the Company's non-cancelable purchase orders as required by GAAP.

118. Lead Plaintiff Alan Richards and other members of the Class did not know that the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements not misleading.

119. Lead Plaintiff Alan Richards and other members of the Class who purchased Violin Memory securities in the IPO from the Underwriter Defendants have sustained damages as a result of the untrue statements of material facts and omissions in the Registration Statement, for which they hereby elect to rescind and tender their shares of Violin Memory common stock in return for the consideration paid for Violin Memory common stock with interest.

120. This claim was brought within the applicable statute of limitations.

121. By virtue of the foregoing, the Underwriter Defendants have violated Section 12(a)(2) of the Securities Act.

## COUNT III

**The Individual Securities Act Defendants Violated Section 15 of the Securities Act**

122. Plaintiffs repeat and reallege the allegations contained above.

123. Each of the Individual Securities Act Defendants participated in the operation and management of Violin Memory at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Violin Memory's business affairs.

124. Each of the Individual Securities Act Defendants was involved in the day-to-day operations of the Company at the highest levels.

125. Each of the Individual Securities Act Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

126. The Individual Securities Act Defendants were senior officers and directors of Violin Memory. Due to their positions of control and authority, the Individual Securities Act Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

127.   The Individual Securities Act Defendants each signed, or caused to be signed on their behalf, the Registration Statement.

128.   The Individual Securities Act Defendants were controlling persons of Violin Memory under the Securities Act.

129.   Violin Memory's conduct, as alleged herein, constitutes a violation of Sections 11 and 12(a)(2) of the Securities Act.  The Individual Securities Act Defendants are liable to Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as Violin Memory, for violations under Section 15 of the Securities Act.

## IV.   <u>CLASS ALLEGATIONS</u>

130.   Plaintiffs bring this action on behalf of all individuals and entities who purchased or otherwise acquired Violin Memory securities in connection with the Company's IPO and/or on the public market during the Class Period, and were damaged, excluding the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

131.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Violin Memory securities were actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Violin Memory or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon completion of the IPO, Violin Memory had 81,824,358 outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

132.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in

violation of the federal laws complained of herein.

133.    Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by the Securities Act Defendants' respective acts as alleged herein;

(b)    whether the Individual Securities Act Defendants and the Underwriter Defendants acted negligently; and

(c)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all the Securities Act Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, or rescission;

1          (c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

2               in this action, including counsel fees and expert fees; and

3          (d)     Such other and further relief as the Court may deem just and proper.

4   **VI.**    **JURY DEMAND**

5       Plaintiffs hereby demand a trial by jury.

6

7                              Respectfully submitted,

DATED:  November 21, 2014     KAPLAN FOX &KILSHEIMER LLP

8

9                          By:  /s/  Laurence D. King
                                Laurence D. King

10

11                        Laurence D. King (SBN 206423)
                       Mario M. Choi (SBN 243409)

12                        KAPLAN FOX &KILSHEIMER LLP
                       350 Sansome Street, Suite 400

13                        San Francisco, CA 94104
                       Tel: 415-772-4700

14                        Fax: 415-772-4707
                       lking@kaplanfox.com

15                        mchoi@kaplanfox.com

16                        Jeffrey P. Campisi (admitted *pro hac vice*)
                       KAPLAN FOX & KILSHEIMER LLP

17                        850 Third Avenue, 14th Floor
                       New York, NY 10022

18                        Telephone: 212-687-1980
                       Facsimile: 212-697-7714

19                        jcampisi@kaplanfox.com

20                        Nicholas I. Porritt (admitted *pro hac vice*)
                       Adam M. Apton (admitted *pro hac vice*)

21                        LEVI & KORSINSKY LLP
                       1101 30th Street NW, Suite 115

22                        Washington, DC 20007
                       Tel: (202) 524-4290

23                        Fax: (202) 337-1567
                       nporritt@zlk.com

24                        aapton@zlk.com

25                        *Attorneys for Lead Plaintiffs Ali Shehk and Alan Richards, and the Proposed Class*

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Laurence D. King, hereby declare that on November 21, 2014, I caused the document entitled "**Amended Consolidated Class Action Complaint**" to be electronically filed with the Court.  Service was affected upon all parties in the action registered with the Court's CM/ECF system, which sent notification of the filing to counsel of record.

*/s/ Laurence D. King*

Laurence D. King

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

EXHIBIT "A"



## CERTIFICATION

I, Alan Richards, hereby certify and swear as follows:

1. I have reviewed a complaint against Violin Memory, Inc. alleging violations of the securities laws and authorize the filing of a complaint;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter:

4. The following is a description of my transactions in the common stock of Violin Memory, Inc. since the Company's IPO:

| Transaction | Quantity | Price Per Share | Date |
|---|---|---|---|
| Purchase | 4,000 | $9.00 | 9/27/2013 |
| Sold | 2,000 | ~~$6.88~~ $6.85 AR | 10/30/2013 AR |

5. I did not purchase Violin Memory, Inc. common stock at the direction of my counsel, or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Alan Richards

Date: December 8, 2013

EXHIBIT "B"

AMENDED CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

    I, Ali Shehk, duly certify and say, as to the claims asserted under the federal securities laws, that:

    1.    I have reviewed a complaint filed in this action.

    2.    I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

    3.    I remain willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial if necessary.

    4.    I, through my attorneys, Levi & Korsinsky, LLP, moved for appointment as lead plaintiff on January 27, 2014. In connection with the motion, I provided my attorneys with a list of what I believed to comprise the entirety of my transactions in the security at issue in this action.

    5.    Subsequent to moving for appointment as lead plaintiff I discovered additional transactions in the security at issue during the class period. These transactions, in addition to those previously disclosed, are set forth in the chart attached hereto.

    6.    Within the last 3 years, except for this action, I have not sought to serve nor have I served as a class representative in any federal securities action.

    7.    I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    I hereby certify, under penalty of perjury, that the foregoing is true and accurate. Executed this 24 day of March 2014.

                                                 _____
                                                 ALI SHEHK

Ali Shehk
**Transactions in Violin Memory, Inc. (VMEM)**

| Date of Purchase | Buy (B) or Sell (S) | Quantity | Price ($) | Cost/Proceeds ($) |
|---|---|---|---|---|
| 9/27/2013 | B | 25000 | 7.07 | 176750 |
| 9/27/2013 | B | 22500 | 7.70 | 173250 |
| 9/27/2013 | B | 7000 | 7.70 | 53900 |
| 9/27/2013 | B | 300 | 7.69 | 2307 |
| 9/27/2013 | B | 200 | 7.68 | 1536 |
| 9/27/2013 | S | -500 | 7.39 | -3695 |
| 9/27/2013 | S | -900 | 7.36 | -6624 |
| 9/27/2013 | S | -1100 | 7.37 | -8107 |
| 9/27/2013 | S | -27500 | 7.35 | -202125 |
| 9/30/2013 | S | -4145 | 7.33 | -30382.85 |
| 9/30/2013 | S | -20855 | 7.31 | -152450.05 |
| 10/2/2013 | B | 25000 | 7.73 | 193250 |
| 10/21/2013 | S | -15000 | 7.25 | -108750 |
| 11/14/2013 | B | 100 | 5.87 | 587 |
| 11/14/2013 | B | 2175 | 5.88 | 12789 |
| 11/22/2013 | S | -11075 | 3.2 | -35440 |
| 11/22/2013 | S | -1200 | 3.2 | -3840 |

EXHIBIT "C"



Dear Prospective Investor:

As you may know, Violin Memory, Inc. announced an initial public offering of common shares. The offering will be made through a group of underwriters with J.P. Morgan Securities LLC acting as a book-running manager. We have set aside a limited number of common shares for officers, directors, employees, friends and family of Violin Memory, Inc. to purchase through a program we call the Directed Share Program and arrangements have been made with J.P. Morgan Securities LLC to handle the sale of these common shares for the benefit of the participants in the Directed Share Program. The purchase price if you buy common shares through the Directed Share Program is the same as the offering price to the public, which is expected to be between 8.00 - 10.00 USD. Please note that you are not obligated to purchase any shares, and we are not recommending, encouraging or discouraging your participation in our proposed offering. This notice is simply intended to inform you of the proposed offering in case you might be interested in participating.

Purchases of common shares through the Directed Share Program may be made only through a brokerage account at J.P. Morgan Securities LLC. Please be certain to complete the packet in all respects, including the information requested on the new account form. It is the policy and practice of J.P. Morgan Securities LLC to afford confidentiality to any information it receives about a client's financial affairs. J.P. Morgan Securities LLC may, however, share certain information with us in order to determine how best to allocate common shares under the Directed Share Program. J.P. Morgan reserves the right to deny participation in the Directed Share Program based on incomplete information and/or based on the participant's financial suitability in relation to indication of interest.

You are permitted to express an interest in common shares only for your own personal account and not on behalf of any other person. The common shares may not be purchased on margin. Your indication of interest is not a binding commitment and may be withdrawn when you are asked by J.P. Morgan Securities LLC to confirm your indication of interest or at any earlier time.

In the event that the aggregate indications of interest exceed the maximum number of common shares reserved for the Directed Share Program, common shares will be allocated among the participants in the Directed Share Program in a manner determined by Violin Memory, Inc..

If you have an interest in purchasing common shares in the public offering, please proceed by selecting the "I am interested in continuing with the Directed Share Program and consent to receiving electronic information documents" button at the bottom of the page and pressing the "Next" button to proceed with completing the following:

- Client Questionnaire
- Account Information Form
- Tax Form W9
- Client Agreement
- Indication of Interest

You also will have the opportunity to review the preliminary prospectus and acknowledge that you have reviewed it. If you have any other questions, please call J.P. Morgan Securities LLC Directed Share Plan Team at (855) 215-2790 between the hours of 9 a.m. - 5 p.m. Eastern Time, Monday through Friday.

After the offering price of the common shares has been determined, you will be notified that the offering price and allocation information is available by email so that you may review this information online. At this time, you will be able to review the number of common shares allocated to you and the purchase price. You must then confirm the number of shares you wish to purchase online. Upon confirmation of the purchase, you will have entered into a binding legal contract to purchase the common shares and you must pay for them. Following such confirmation, a written confirmation of the sale will be mailed to you. Full payment is required by settlement date, which is three (3) business days after the trade date. Payment information will be provided to you when you confirm your allocation. Please contact The Directed Share Plan Team, J.P. Morgan Securities LLC at (855) 215-2790 with any related questions. Failure to pay in full by settlement date will result in the **immediate** cancellation of your share purchase.

We are delighted to invite you, as a friend of Violin Memory, Inc., to participate in the Directed Share Program. However, we do not wish to influence in any way your decision in this matter. The purchase of common shares involves certain risks which are described in the preliminary prospectus.

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities. A registration statement relating to these securities has been filed with the Securities and Exchange Commission but has not yet become effective. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective.

No offer to buy the securities can be accepted and no part of the purchase price can be received until the registration statement has become effective, and any such offer may be withdrawn or revoked, without obligation or commitment of any kind, at any time prior to notice of its acceptance given after the effective date.

A written preliminary prospectus may be obtained from J.P. Morgan Securities LLC, c/o Broadridge Financial Solutions,,1155 Long Island Avenue, Edgewood, New York 11717, Attention  Prospectus Department or by calling (866) 803-9204.

This J.P. Morgan Securities LLC Directed Share Plan E-Sign Disclosure ("**Disclosure**") applies to all Communications related to your online participation in the Directed Share Plan (your "**Participation**").

The words "**we**", "**us**", and "**our**" refer to J.P. Morgan Securities LLC and the words "**you**" and "**your**" mean you, the individual(s) or entity identified. As used in this Disclosure, "**Communication**" means any disclosures, documents, notices, and all other information related to your Participation, including but not limited to information that we are required by law to provide to you in writing.

1.   **Scope of Communications to Be Provided in Electronic Form.** You agree that we may provide you with any Communications in electronic format, and that we may discontinue sending paper Communications to you, unless and until you withdraw your consent as described below. Your consent to receive electronic Communications and transactions includes, but is not limited to:

- Disclosures required by federal  and/or state law

ter of Notice
Page 2 o
Case4:13-cv-05486-YGR   Document90   Filed11/21/14   Page43 of 50

- Tax Form (W-9
- Indication of Interest
- Confirmation of Allocation

2.  **Method of Providing Communications to You in Electronic Form.** All Communications that we provide to you in electronic form will be provided either (1) via e-mail, (2) by access to a web site that we will designate in an e-mail notice we send to you at the time the information is available, (3) to the extent permissible by law, by access to a web site that we will generally designate in advance for such purpose, or (4) by requesting you download a PDF file containing the Communication.

3.  **How to Withdraw Consent.** You may withdraw your consent to receive Communications in electronic form by contacting us at a **JPMorgan Representative.** At our option, we may treat your provision of an invalid email address, or the subsequent malfunction of a previously valid email address, as a withdrawal of your consent to receive electronic Communications. Any withdrawal of your consent to receive electronic Communications will be effective only after we have a reasonable period of time to process your withdrawal.

4.  **How to Update Your Records.** It is your responsibility to provide us with true, accurate and complete e-mail address, contact, and other information related to this Disclosure and your Participation, and to maintain and update promptly any changes in this information. Please contact the Directed Share Plan Team at J.P. Morgan Securities LLC at (855) 215-2790 to update any information

5.  **Hardware and Software Requirements.** In order to access, view, and retain electronic Communications that we make available to you, you must have:

   Operating Systems:
   - Windows 2000 (Service Pack 2), Windows 2003, Windows XP, Windows Vista, Windows 7;
   - Mac OS X 10.6

   Web Browsers:

   - Internet Explorer 6.0, Internet Explorer 7.0 or Internet Explorer 8.0 (compatibility mode)
   - Mozilla Firefox version 3.6 and higher
   - Apple Safari version 3.2 and higher

   Monitor:

   - Minimum 1280x1024 resolution

   Applications:

   - MSXML 3.0
   - Adobe Acrobat Reader 5.0 or higher
   - Microsoft Office 2000 or later (Excel, Word, Outlook)

6.  **Requesting Paper Copies.** We will not send you a paper copy of any Communication, unless you request it or we otherwise deem it appropriate to do so. You can obtain a paper copy of an electronic Communication by printing it yourself or by requesting that we mail you a paper copy. To request a paper copy, contact us by telephone. We may charge you a reasonable service charge, of which we have provided you prior notice, for the delivery of paper copies of any Communication provided to you electronically pursuant to this authorization. We reserve the right, but assume no obligation, to provide a paper (instead of electronic) copy of any Communication that you have authorized us to provide electronically.

7.  **Communications in Writing.** All Communications in either electronic or paper format from us to you will be considered "in writing." You should print or download for your records a copy of this Disclosure and any other Communication that is important to you.

8.  **Federal Law.** You acknowledge and agree that your consent to electronic Communications is being provided in connection with a transaction affecting interstate commerce that is subject to the federal Electronic Signatures in Global and National Commerce Act ("Act"), and that you and we both intend that the Act apply to the fullest extent possible to validate our ability to conduct business with you by electronic means.

By clicking the "I am interested in continuing with the and consent to receiving electronic information and documents" button below you confirm that you have read and agree to the terms and conditions set forth in this E-Sign Disclosure and wish to learn more about the . You also agree that your computer satisfies the hardware and software requirements this Disclosure specifies. Therefore, you give us your affirmative consent to provide electronic Communications to you as described herein.

I understand that the account being opened with J.P. Morgan Securites LLC is solely meant to facilitate this and will coordinate with a J.P. Morgan Securities LLC account representative to discuss further investment opportunities and requirements.

&#9673; I am interested in continuing with the Directed Share Program and consent to receiving electronic information and documents.

&#9711; I am not interested in purchasing any shares.

Frequently Asked Questions    Glossary    Client Contact

Copyright © JPMorgan Chase & Co. All rights reserved.

n Initial Public Offering (IPO) is an offering of stock to the public. In a secondary or primary offering an IPO allows a young ompany to fund future expansion. Investors allocated common shares of stock in an IPO pay the offering price.

### Vhat is a Directed Share Program?

. Directed Share Program allows employees and certain friends of the corporation an opportunity to invest in the underlying company at the original IPO price.

### friend or relative of an invited participant also purchase common share in the Program?

cause there are only a limited number of common shares available for the Directed Share Program, only those participants who have been mailed the ocuments may purchase common shares. The completion of all account opening forms and an Indication of Interest does not guarantee an allocation of common hares.

### Vhat is the minimum number of common shares I can purchase at the IPO price?

he minimum investment is 100common shares of stock and multiples of 100common shares thereafter (i.e., 200, 300, 400, etc.). Please note that your indication of iterest can be for as many common shares as you desire. However, your actual allocation will be determined at the time of pricing.

### low will I know how much money I will owe?

he stock is expected to price between 8.00 and 10.00. So, for example, if the stock prices at 8.00 and you receive 100 common shares of stock, you will owe $800.00 the stock prices at 10.00 and you receive 100 common shares. you will owe $1000.00.

### s there a charge to open an account with J.P. Morgan Securities LLC and/or buy common shares at the IPO price?

n order to receive IPO common shares, an account MUST be opened with J.P. Morgan Securities LLC. Participants in the Directed Share Program will not be charged fee to open an account with J.P. Morgan Securities LLC and/or to buy common shares at the IPO price.

### Vhen and how do I pay for my common shares of stock?

ommon shares purchased at the initial offering price must be paid for in full no later than three business days after the new stock is priced (trade date). Funds may be ent via federal wire, per the following instructions. **You will only be obligated to pay for common shares after you confirm your interest.**

**Failure to pay in full by settlement date will result in the immediate cancellation of your share purchase.***

Vire Instructions
.P. Morgan Chase NA
)ne Chase Plaza
Jew York, NY 10005
\BA (routing #): 021000021
)DA (Demand Debit Account=JPMCC Bank account): 066001633
.P. Morgan Clearing Corp.
urther Credit To (beneficiary account number): 27104866
urther Credit To (beneficiary account name): Alan Richards

### V  will I be notified of the number of common shares I received in the Initial Public Offering?

organ Securities LLC will notify all participants on the day the offering is priced. **At this time you will also receive your J.P. Morgan Securities LLC ccount number.**

### Vhy must I supply personal financial information when signing up for an account?

.P. Morgan Securities LLC is required to obtain financial information regarding an investor in order to conduct business and determine suitability for participation in an >O. Personal information distributed to J.P. Morgan Securities LLC will be viewed only by those implementing the Directed Share Program at J.P. Morgan Securities LC.

### Vho do I contact if I have any questions?

or technology/system questions, please contact:
oreo Client Services
(866) 457-5032 or (212) 849-5032
elp@ipreo.com
or other inquiries, please contact:
)irected Share Plan Team
'hone: (855) 215-2790

### cannot proceed to the next step.

:heck to ensure that you filled out all forms completely and correctly (at the top of the page if you forgot to enter information for a required field there will be a list of the rrors in red). If you still cannot continue contact i-Deal. (212) 849-5032 or 866-457-5032, 8am-8pm (-12am after allocations are sent out)

### deleted my e-mail by accident, who should I contact to have another sent out?

:ontact a J.P. Morgan Securities LLC representative to request to have your invitation resent.

### am unable to confirm my allocation.

'lease contact a J.P. Morgan Securities LLC representative to verify that your indication of interest has been approved/allocated by him/her.

### s there a point when the system will automatically log me out?

he system will automatically log you out after 1 hour.

### tried resetting my password and a message displayed telling me my password didn???t meet the proper qualifications. What should I do?

'our password must contain at least 1 uppercase letter, at least 1 lowercase letter, and at least 1 number and be 7 characters or longer. Additionally your password annot contain your first name, last name, symbols or social security number.

### (  my password, what should I do?

:ontact i-Deal. (212) 849-5032 or 866-457-5032, 8am-8pm (8am-12am after allocations are sent out)

### have entered my indication, now what do I do?

you receive an allocation you will receive an email notification leading you the website to review the updated prospectus and/or updated deal information, and then to he allocation confirmation steps to confirm the common shares you wish to purchase.

lo, the account opened through this directed share plan invitation is solely for the purposes of this transaction. In order to open an account for other investments, lease contact a J.P. Morgan Securities LLC representative for assistance.

**low will deal information be communicated?**

iformation for this deal will be communicated electronically via email and the web application. If you are unable to complete this process electronically, please contact Morgan Securities LLC representative for assistance.

**Close**

Required fields are displayed in red.

○ I am interested in purchasing [10,000] shares (minimum 100 in multiples of 100) of the Company.

○ I am not interested in purchasing any shares of the Company.

I acknowledge that:

1. I have received a copy of the preliminary prospectus.
2. I am not assured of obtaining any, or all, of the number of shares requested hereby.
3. The number of shares requested is for my own personal account and not on behalf of any other person.
4. I am aware that full payment for the purchase price of the shares allotted to me, if any, will be required promptly after I receive confirmation of any allocation of shares to me. I am not sending any money at this time.
5. This indication of interest involves no obligation or commitment of any kind and by completing this form, I am not binding myself to purchase any shares of the Company's stock. I understand that the purpose of this form is to provide some indication of how many shares may be requested by "friends" of the Company and that I will be notified by J.P. Morgan Securities LLC of the number of shares, which are available for purchase, by me.
6. I understand that the final offering price per share cannot be determined until after the Registration Statement covering the proposed offering is declared effective. One copy of the prospectus in final form will be available at that time, along with a confirmation of my purchase.
7. I understand that an arrangement has been made with J.P. Morgan Securities LLC for the sale of the reserved shares and that when the Registration Statement covering the proposed offering is declared effective, I will be notified electronically or by a J.P. Morgan Securities LLC Account representative to confirm my allocation of shares. At that time, I may choose to withdraw my indication of interest or to purchase a portion or all of the shares allocated to my account. I understand that my indication of interest may be withdrawn or revoked without obligation or commitment of any kind at any time prior to confirmation after the effective date of the registration statement.
8. I understand that I will not receive the proceeds from the sale of any shares until such shares have been paid for in full.
9. I understand that by entering an Indication of Interest, I am not guaranteed to receive shares.
10. I understand that the account being opened with J.P. Morgan Securities LLC is solely meant to facilitate this Directed Share Plan and will coordinate with a J.P. Morgan Securities LLC account representative to discuss further investment opportunities and requirements.

☑ **By checking this box and typing my name in the Signature box below, I certify that the above information is accurate and complete in all respects. I also certify that I am not a restricted party as previously certified in the Client Questionnaire.**

Date: [9] / [21] / [2013]

(ex. 5/31/2006)

Signature: [ ]

(type First and Last Name)

**Frequently Asked Questions    Glossary    Client Contact**

Copyright © JPMorgan Chase & Co. All rights reserved.

Thank you for your indication of interest. You will be notified by e-mail when the deal is priced and whether or not you will be allocated common shares.

**This deal is currently expected to price on or around 09/26/13.**

After the registration statement is effective, and assuming you meet certain regulatory requirements and have been approved by J.P. Morgan Securities LLC, you will be informed by e-mail and/or phone of the exact offering price per common share at that time, as well as the number of common shares allocated to you and you asked if you still wish to purchase the common shares. **If you do not confirm your interest in purchasing common shares in the offering, you will not be able to purchase common shares in the program and will not be allocated any common shares.**

If you confirm your intention to purchase common shares, a copy of the prospectus, in final form, will be emailed to you by J.P. Morgan Securities LLC.

**Full payment of the purchase price of your common shares will be required promptly after you receive written confirmation of the sale, but in no event later than three (3) business days after your allocation has been confirmed with J.P. Morgan Securities LLC.**

Copyright © JPMorgan Chase & Co. All rights reserved.

| | |
|---|---|
| **Number of Common shares You Requested:** | 10,000 Common shares |
| **Number of Common shares You Were Allocated:** | 4,000 Common shares |
| **I Wish to Purchase:** | 4,000 Common shares |
| **Common share Price:** | 9.00 USD |
| **Amount Owed:** | 36,000.00 USD |

○ **Confirmation:** I hereby confirm that I am purchasing **4,000** common shares of Violin Memory, Inc. at a price of **9.00 USD** per common share for a total sum of **36,000.00 USD**. I understand that this is a final order and constitutes a purchase that cannot be revoked or changed. **Important Note:** You must complete payment of your allocated shares prior to the settlement of the shares to you. A delay in payment may delay settlement of your allocated shares to you. Accordingly, if you intend to sell your allocated shares soon after they become available, you should pre-fund your account to help prevent a delay in your ability to sell your allocated shares.

○ **Cancellation:** I do not wish to purchase common shares in the Directed Share Program for the Violin Memory, Inc. IPO.

Frequently Asked Questions    Glossary    Client Contact

Copyright © JPMorgan Chase & Co. All rights reserved.

EXHIBIT "D"

# J.P.Morgan

REDACTED

REDACTED

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Private Bank
Directed Share Plan Team
270 Park Avenue
5th Floor
New York, NY 10017
Phone: 1-855-215-2790

**CLEARED THROUGH** I
WHOLLY OWNED SUBSIDIARY

J.P. Morgan Clearing Corp.
Three Chase Metrotech Center
Brooklyn, New York 11245-0001

Page 1 of 1

MR ALAN RICHARDS

| | |
|---|---|
| Processing Date | 9/27/13 |
| Account Number | |
| Account Executive | |

## CONFIRMATION
### WE ARE PLEASED TO CONFIRM THE FOLLOWING TRANSACTION(S)

## EQUITIES AND OPTIONS

| Trade Date | Settlement Date | Bought/ Sold | Description | Symbol/ CUSIP | Quantity | Price | Money Type | Money Amount | Type | C | Trade Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/27/13 | 10/02/13 | Bought | VIOLIN MEMORY INC SOLD PURSUANT TO REGISTRATION STATEMENT OR WHERE PROSPECTUS OTHERWISE REQUIRED SEE NOTE Y ON BACK 98A ALIAS: DMS | VMEM 92763A101 | 4,000 | 9.00 | Principal NET AMOUNT | 36,000.00 36,000.00 | Cash | 7 | V2370 |

REDACTED